RAFAEL HERNÁNDEZ COLÓN y LILA MAYORAL DE HERNÁNDEZ, por sí y en representación de la SOCIEDAD DE GANANCIALES compuesta por ellos, demandantes y recurrentes, *v.* JULIO CÉSAR PÉREZ, SECRETARIO DE HACIENDA, demandado y recurrido.

Números: R-82-600,     Resueltos: 16 de marzo de 1984
R-82-604

*Rafael Hernández Matos,* abogado de los recurrentes; *Héctor Urgell Cuebas,* abogado del demandado recurrido.

PER CURIAM: Para julio de 1980 el entonces Secretario de Hacienda Sr. Julio César Pérez notificó al Sr. Rafael Hernández Colón haber concluido una investigación de sus obligaciones fiscales en la que identificó deuda contributiva sobre propiedad en varios inmuebles del contribuyente. Éste impugnó las determinaciones y la sala de instancia estimó la

demanda en cuanto al edificio en Sol núm. 1, Viejo San Juan y la casa en Sol núm. 9, Ponce; y la denegó respecto al apartamento Condominio Belén P.H. 1, Guaynabo (excepto una partida de intereses); y un solar agrupado al inmueble en Sol núm. 9, Ponce.

Ambas partes han recurrido en revisión y considerados sus extensamente argumentados escritos de solicitud y oposición a la expedición del auto, el caso es de solución viable bajo la Regla 50 de nuestro Reglamento.

*Recurso R-82-600 del contribuyente*

El 29 de septiembre de 1977 el contribuyente y su esposa adquirieron el apartamento P.H. 1 en el Condominio Belén, Guaynabo por compra a Atlantic Quality Corp., la firma constructora del edificio. Hacienda les reconoció exención de Ley Núm. 98 ([1]) de junio 2, 1976 y canceló el recibo de contribuciones para los años 1978–79 y 1979–80 con autoridad en la citada Ley Núm. 98 que dispuso:

. . . . . . . .

Artículo 1.—

Los dueños de propiedades adquiridas, durante el período comprendido entre el 1ro. de octubre de 1974 y el 1ro. de octubre de 1977, directamente de la persona que la construyó o que adquirió el proyecto de viviendas para la venta, que cualifiquen para exoneración contributiva en la cuantía, del modo y bajo las condiciones que establece la Ley núm. 269, aprobada en 11 de mayo de 1949, según enmendada, quedan exentos del pago de contribución sobre la propiedad, durante los primeros tres años contributivos inmediatos a la fecha de adquisición de la vivienda.

Sección 3.—

Se exime a toda persona que adquiera, dentro del término comprendido entre la fecha de aprobación de esta ley y el 1ro. de octubre de 1977, directamente de la persona que la construyó o que adquirió el proyecto de viviendas para la venta, una propiedad nueva construida para y dedicada a vivienda,

---

([1]) Enmendatoria de la Ley Núm. 3 de noviembre 14, 1974.

del pago de contribuciones sobre la propiedad durante los primeros dos años fiscales inmediatos a partir de su fecha de adquisición.

En la investigación, el Secretario revocó la exención sobre el fundamento de que Atlantic Quality, vendedora del demandante y constructora del edificio, no fue persona que construyera o que adquiriera el proyecto de viviendas para la venta dentro del diseño conceptual del estatuto. La sala de instancia concluyó que "el legislador, temiendo el fracaso económico de los desarrolladores o constructores, un efecto adverso sobre los suplidores de materiales y un aumento en la tasa de desempleo, aprobó las leyes Núms. 2 y 3 (²) del 14 de noviembre de 1974 con el propósito de proveer algún alivio a la situación prevaleciente". Su correcta apreciación de que este incentivo iba dirigido a frenar el colapso de la industria de la construcción, en el amplio ámbito generador de bienestar económico, arranca de la Exposición de Motivos de la referida Ley Núm. 98 de 1976 que en parte dice:

> Dicha exención contributiva fue concedida con el propósito de proveer algún alivio a la crítica situación económica por la cual atraviesa la industria de la construcción de hogares. De este modo, se ha logrado estimular considerablemente la venta de un gran número de viviendas terminadas cuya demanda ha sido sumamente limitada. Así también, se ha evitado el fracaso económico de varias empresas dedicadas a esta industria y el consecuente desempleo.
>
> Sin embargo, existen indicios claros de que nuestra economía no ha alcanzado un grado de recuperación que le permita a la industria de la construcción continuar su auge sin la ayuda de incentivos como los antes descritos.
>
> Hace falta por lo tanto prorrogar el incentivo contributivo que se está ofreciendo a las familias que compren viviendas. . . .

Atlantic Quality no sólo fue contratista general constructora del edificio sino que compartió responsabilidad de empresario desarrollador al garantizar y viabilizar en parte

---

(²) Antecesoras de la Ley Núm. 98 de junio 2, 1976.

el financiamiento de la obra al asumir una deuda de la desarrolladora (EDAMORGA) con el Banco de Ponce por $30,000 y al adquirir de ella para la venta los tres apartamentos *penthouses* 1, 2 y 3 del Condominio Belén. En la venta del apartamento P.H. 1 al demandante no hubo solución de continuidad en la tradición directa de constructor a comprador de vivienda, se cumplió el propósito legislativo de favorecer al adquirente de una vivienda de nueva construcción de manos de la propia constructora. La declarada intención del estatuto de evitar el fracaso económico de empresas constructoras, de proveer alivio a la crisis en la construcción de hogares e incentivo contributivo a los compradores de viviendas, necesariamente extiende su acción y efecto eximente a la adquisición del apartamento P.H. 1 por el demandante y descarta toda interpretación de la figura "persona que la construyó" que excluya al constructor de facto, el más dinámico factor de producción en la industria, con reiterada razón si la constructora Atlantic Quality participó en la función de desarrollador coadyuvando al éxito económico del proyecto y adquiriendo los tres apartamentos P.H. exclusivamente para la venta. Se ajustó a Derecho el primer criterio de Hacienda que otorgó la exención y canceló los recibos de los dos años siguientes a la fecha de adquisición.

El contribuyente adquirió en 1962 la casa de Calle Sol núm. 9, Ponce, en la que constituyó su vivienda y desde entonces disfrutó de la exoneración contributiva hasta $15,000 de valoración ordenada por Ley Núm. 24 de junio 8, 1962 (13 L.P.R.A. sec. 402). Esta ley dispone que "[c]ualquier contribuyente . . . vendrá obligado a notificar . . . cualesquier cambios en sus cualificaciones para disfrutar de la exoneración del pago de contribuciones aquí concedido y de cualesquier traspaso y modificaciones del dominio sobre la propiedad . . .". (Párr. 13.) En septiembre de 1973 los padres del demandante le donaron un solar de 340.57 m/c en Sol núm. 7, Ponce, que éste agrupó al de su residencia. El valor tasado

de la vivienda era de $11,170 y el del solar donado $3,010 por lo que la agrupación no resultó en exceso del límite permisible en la exoneración, y evidentemente no constituyó "cambio en las cualificaciones" del contribuyente, ni traspaso ni modificación del dominio que afectara el estado contributivo de la residencia.

El Secretario alega, y la sala de instancia aceptó su planteamiento de que sí hubo tal cambio y modificación del dominio, que debió notificarse y que en su defecto el demandante adeuda contribuciones sobre el solar donado. El párrafo 6 de la Ley Núm. 24 citada señala como cualificaciones del contribuyente acogido a la exoneración, que sea dueño del inmueble que esté siendo utilizado como vivienda por él o su familia, sin que perciba renta por su ocupación. Resulta de patente convicción que la agrupación del solar, sin más consecuencia que agrandar el patio de la casa dentro de los límites de valor tasado, en forma alguna afectó, alteró o cambió dichas cualificaciones ni mucho menos significó un traspaso o modificación del dominio de notificación compulsoria. No se produjo situación alguna de evasión contributiva que la ley tiende a impedir, como el cambio de dueño, la conversión de la vivienda a otros fines o afectación de su disponibilidad, que de no ser notificados permitirían una continuación inmerecida de la rebaja. Signo adicional de que el contribuyente no se amparó en la clandestinidad lo constituye la notificación de la donación al propio Negociado de Tasación de la Propiedad en cumplimiento de la Ley de Contribuciones sobre Caudales Relictos y Donaciones. El caso se reduce a la simple ampliación del patio de una vivienda, inadvertida para el Negociado de Tasación, que al aflorar en la investigación del Secretario no debió ir más lejos que un requerimiento al donatario de informe escrito sobre el cambio de *status* del solar donado al integrarse y fundirse con el de una vivienda que disfruta exoneración contributiva. Dentro de las circunstancias relatadas, no era de rigor la notificación de "Ley 24" al Secretario, e integrado el solar al de la

vivienda sin rebasar los límites de la exoneración, no tiene el contribuyente otra responsabilidad contributiva por el solar donado, que la resultante de una retasación del actual inmueble incluyendo estructura si excediere de $15,000.

### Recurso R-82-604 del Secretario

El Secretario de Hacienda apunta como errores en la sentencia recurrida: 1) haber reconocido exoneración de propiedad dedicada a fines residenciales en la casa de la Calle Sol núm. 9, Ponce, para los años fiscales 1978–79, 1979–80 y 1980–81; y 2) exonerar al contribuyente del pago de intereses y recargos de mora sobre la deuda contributiva en el Condominio Belén P.H. 1, Guaynabo. Acabamos de determinar la inexistencia de dicha deuda, toda vez que el referido apartamento fue correctamente exento de tributo por los dos años siguientes a la fecha de su adquisición —Ley Núm. 98 de junio 2, 1976— y en consecuencia este segundo señalamiento de error se ha tornado académico.

Como ya dijimos, el contribuyente disfruta desde 1962 de exoneración contributiva "hasta quince mil dólares de valoración" en casa destinada exclusivamente a vivienda en Sol núm. 9, Ponce. La posición del Secretario recurrente es que el demandante perdió esa concesión desde que en 1977 adquirió el apartamento residencial del Condominio Belén P.H. 1, Guaynabo, el que habita con su familia. En cuanto concierne a este argumento la Ley Núm. 24 de 8 de junio de 1962 (13 L.P.R.A. sec. 402) ordena:

> Se entenderá que se dedica para "fines residenciales" cualquier estructura que el día 1ro. de enero de cada año esté siendo utilizada como vivienda por su dueño o su familia, o cualquier nueva estructura, construida para la venta y tasada para fines contributivos a nombre de la entidad o persona que la construyó si a la fecha de la expedición del recibo de contribuciones está siendo *utilizada o disponible para ser utilizada* por el adquirente como su vivienda o la de su familia, siempre que el dueño no recibiera renta por su ocupación;
>
> .    .    .    .    .    .    .    .    .

Los beneficios de las secs. 402 a 404 de este título se limitan a una sola vivienda en todos los casos en que un mismo dueño tenga más de una propiedad. (Énfasis suplido.)

■ Como indica el texto precedente de la ley, la exoneración contributiva no es incompatible con la posesión por el contribuyente de más de una vivienda; así lo reconoce el Reglamento de la "Ley 24" —Sec. 4, Art. 12— citado por el Secretario al disponer que cuando el mismo contribuyente posea más de una vivienda será de su "exclusiva discreción . . . seleccionar la vivienda sobre la cual desea acogerse a la rebaja contributiva, que puede ser aquélla en que él reside o aquélla en que residen sus familiares".(3)

Las constancias en autos muestran que la casa en Sol núm. 9, Ponce, se ha mantenido desde su adquisición *disponible* como vivienda del contribuyente y que así lo ha querido éste por su arraigo domiciliario en aquella ciudad en cuyo registro electoral permanece como votante. No se cometió el error señalado.

No consideramos de lugar pasar sobre señalamientos de los recurrentes de alegado discrimen y persecución política. No fueron objeto de adjudicación por el tribunal de instancia. Ello no es óbice, sin embargo, para detener nuestra función revisora. Hemos optado por adjudicar el recurso dentro de estricto Derecho contributivo, en vez de posponer por tiempo indefinido la decisión del caso.

Se modifica la sentencia recurrida a los efectos de reconocer la exención contributiva en Condominio Belén P.H. 1 por el término legal de dos años, y de eliminar la responsabilidad contributiva de $1,499.19 impuesta al demandante por

---

(3) Notamos en el Reglamento elementos restrictivos de la concesión legislativa como en el Art. 12, Sec. 2 que sujeta la "disponibilidad" de la vivienda a la exclusiva interrupción por reparación, reconstrucción o ampliación. Aparte de su contradicción del estatuto la regla incorpora esta definición del término "disponible para ser utilizada por el adquirente como su vivienda o la de su familia" como equivalente a una continua posesión física del inmueble que niega la alternativa al seleccionar la vivienda en que el contribuyente se acogerá a la rebaja. El Reglamento es ineficaz en cuanto pugne con la Ley. *Infante* v. *Tribl. Examinador de Médicos*, 84 D.P.R. 308, 314 (1961). (Citas de esc. 5.)

el solar ubicado en Sol núm. 9, Ponce, sin perjuicio de la , facultad del Secretario de Hacienda de ordenar la retasación de dicho solar conforme a ley. *Así modificada, será confirmada.*

El Juez Asociado Señor Dávila emitó voto separado. El Juez Asociado Señor Negrón García emitió opinión disidente. El Juez Asociado Señor Rebollo López disintió con voto separado.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

Afirma el filósofo R. Von Ihering que la *"defensa del derecho es un deber que tenemos para con la sociedad.* Por eminentes que sean las cualidades intelectuales de un pueblo, si la fuerza moral, la energía, la perseverancia, le faltan, en ese pueblo jamás podrá prosperar el derecho. Cuando la arbitrariedad, la ilegalidad, osan levantar afrentosamente su cabeza, se puede siempre reconocer en este signo, que los que están llamados a defender la ley no cumplen con su deber. Desde el momento en que el derecho no está dispuesto a luchar se sacrifica. Así podremos aplicarle la sentencia del poeta: *'Es la última palabra de la sabiduría; Que sólo merece la libertad y la vida; El que cada día sabe conquistarlas'"*. Citado por O. Maurín Navarro, *Libertad de Asociación*, Argentina, Ed. Sanjuarina, 1967, pág. 17.

Este recurso, más allá de dictaminar normas sobre derecho tributario, plantea serias interrogantes en la dimensión de protección de los derechos constitucionales de todo ciudadano que es adversario político de quienes detentan el poder gubernamental en determinado momento.

A los fines de una adecuada exposición y adjudicación de esas cuestiones, fundamentaremos nuestro disentir de la sentencia de este tribunal sobre las exenciones contributivas. Posteriormente exploraremos el problema de discrimen político.

## I

El 14 de julio de 1980 el Lcdo. Ricardo Muñiz, Secretario Auxiliar de Rentas Internas del Departamento de Hacienda, notificó por carta al Lcdo. Rafael Hernández Colón, —ex gobernador del país y candidato a dicho cargo por el Partido Popular Democrático en las elecciones que se celebrarían en noviembre de ese año— los resultados de una investigación realizada unilateralmente sobre su responsabilidad contributiva. Muñiz adujo que esa gestión se efectuó para aclarar unas interrogantes señaladas a través de la prensa del país. Por instrucciones del Secretario de Hacienda, Julio César Pérez, le indicó e impuso una deuda de contribuciones sobre la propiedad ascendente a $14,290.49, desglosada así: solar en la Calle Sol núm. 7 de Ponce, $1,977.90; solar y casa en la Calle Sol núm. 9 de Ponce, $2,411.25; apartamento P.H. 1, Condominio Belén, Guaynabo, $7,888.36; y solar y casa en la Calle Sol núm. 1, San Juan, $2,013.18. Al otro día, el Departamento de Hacienda emitió un comunicado de prensa en el que daba los detalles de esa investigación a los medios noticiosos del país.

El 24 de julio de 1980 Hernández Colón y su esposa Lila Mayoral, por sí y la sociedad ganacial, impugnaron judicialmente esas determinaciones.

Oportunamente el tribunal dictó sentencia sumaria en la cual anuló las contribuciones impuestas sobre las propiedades localizadas en las Calles Sol núm. 9 de Ponce y Sol núm. 1 de San Juan. Sostuvo la relativa al solar de la Calle Sol núm. 7, agrupado a la propiedad de Sol núm. 9 en Ponce, y confirmó la del apartamento P.H. 1 (oeste) del Condominio Belén, Guaynabo. De este último eliminó los recargos e intereses. No adjudicó expresamente el planteamiento sobre alegado discrimen político.

## II

La sentencia del foro de instancia es jurídicamente correcta en lo concerniente al derecho tributario. Sobre este

extremo debió ser confirmada. No obstante, este Tribunal la modifica y anula también esas contribuciones. Disentimos.

*Apartamento P.H. 1 (oeste), Condominio Belén*

Edamorga Corp., dueña de un inmueble situado en el Municipio de Guaynabo, construyó, a través de Atlantic Quality Construction Corp., un edificio de once (11) pisos sobre el nivel del suelo, cada uno con diez (10) apartamentos, y tres (3) en el *penthouse*. El 28 de julio de 1971 lo sometió al régimen de propiedad horizontal y lo denominó *Condominio Belén*.

El 6 de junio de 1972 Edamorga segregó y vendió los tres apartamentos del *penthouse* a Atlantic por $240,000. Originalmente, la totalidad de la propiedad estaba sujeta a una hipoteca que garantizaba un pagaré al portador ascendente a $1,850,000. Para la fecha de esta transacción los otros 110 apartamentos ya estaban vendidos. Atlantic, en protección de su crédito como fiador del remanente de esa deuda hipotecaria, asumió y retuvo $130,000 para pagarlos al acreedor Banco de Ponce. El balance de $110,000 se estimó satisfecho, por compensación, a base de que Edamorga debía esa suma a Atlantic.

Atlantic adquirió los apartamentos "con la intención de venderlos o alquilarlos". El 31 de agosto de 1973 alquiló el P.H. 3 al Sr. Melville G. Payer. Transcurrió el tiempo y los otros dos continuaron desocupados. El 1 de enero de 1977 rentó el P.H. 2 para la oficina del ex gobernador Rafael Hernández Colón. El 29 de septiembre de 1977 los esposos Hernández Mayoral adquirieron el P.H. 1. En la escritura de esa compraventa Atlantic hizo "constar haber sido la constructora del Condominio del cual [el] apartamento objeto de esta compraventa forma parte y asegurar que este apartamento no ha sido ocupado ni vivido por persona alguna ni se le ha dedicado a uso alguno con anterioridad al traspaso de su posesión a favor del comprador".

En esa misma fecha el licenciado Hernández Colón solicitó la exoneración contributiva de dicho apartamento

para los años 1978-79 y 1979-80, bajo la premisa de ser Atlantic la constructora y vendedora. El 15 de agosto de 1979 la oficina del distrito de San Juan la aprobó. Subsiguientemente, el 14 de julio de 1980, el Secretario de Hacienda dejó sin efecto esa determinación. El tribunal sentenciador sostuvo esa negativa bajo el razonamiento de que la adquisición del apartamento no fue "directamente de la persona que la construyó o que adquirió el proyecto de vivienda para la venta", conforme lo contempla la Ley Núm. 3 de 14 de noviembre de 1974, según enmendada. La Sec. 3 reza:

Se exime a toda persona *que adquiera*, dentro del término comprendido entre la fecha de aprobación de esta ley y el 1ro. de octubre de 1977, *directamente de la persona que la construyó o que adquirió el proyecto de viviendas para la venta, una propiedad nueva construida para y dedicada a vivienda, del pago de contribuciones sobre la propiedad durante los primeros dos años fiscales* inmediatos a partir de su fecha de adquisición. (Énfasis nuestro.)

En buena hermenéutica jurídica la interpretación de toda ley tributaria requiere que se haga siguiendo el método gramatical sin prescindirse de los elementos lógico, histórico y teleológico. "[E]s norma cardinal en interpretación de estatutos que en controversias fiscales debe acudirse en primer término a las leyes y los principios fundamentales que rigen la materia. *Serrallés Galiano* v. *Srio. de Hacienda*, 84 D.P.R. 11 (1961)." *Sucn. Evans* v. *Srio. de Hacienda*, 108 D.P.R. 713, 718 (1979).

De especial interés es el principio de que las exenciones contributivas no se presumen. Tienen que aparecer en lenguaje claro y preciso en el estatuto. *Pujals & Bros.* v. *Srio. de Hacienda*, 89 D.P.R. 263 (1963). Corresponde al que las reclama el peso de probarlas.

Ciertamente Atlantic fue quien, como contratista general, ejecutó la obra para Edamorga. Pero Atlantic sencillamente es la entidad jurídica equivalente al contratista *de obra*. Se dedica a la actividad de la construcción en general.

"La realidad es que en Puerto Rico y más generalmente en los Estados Unidos, las obras más costosas y de mayor importancia se hacen por corporaciones que contratan su ejecución y hacen todos los gastos necesarios, incluyendo desde luego mano de obra, materiales, etc." *Santiago* v. *Torres*, 60 D.P.R. 265, 269–270 (1942).

Ello, sin embargo, no convierte a Atlantic en el *constructor* visualizado en la ley. "El concepto *contratista* va más allá del significado vinculante a la ingeniería. . . ." *Empresas Capote, Inc.* v. *Tribunal Superior*, 103 D.P.R. 765, 772 (1975). El significado verdadero y jurídico, a tono con el espíritu e historial de esta legislación, está inexorablemente atado al concepto de dueño o propietario de la obra. Éste era Edamorga. Bajo supuesto alguno podemos admitir que la Asamblea Legislativa diseñara esta exención de otro modo que no fuera la compra a quien lícita y únicamente podía enajenar una vivienda. No se puede "adquirir" un inmueble de quien no es su dueño, independientemente de que lo haya o no construido. Bajo esta hipótesis no podemos conceder a los contribuyentes Hernández Mayoral que les asista la razón. Está fuera de discusión que ellos no adquirieron el apartamento de Edamorga, única "persona" (entidad corporativa) susceptible de ser situada en la expresión legal "que construyó".

Aclarado este aspecto, analicemos la otra posible alternativa establecida en la ley: una compra directa de quien a su vez "adquirió *el proyecto de viviendas* para la venta". Otra vez el historial legislativo rechaza su aplicabilidad al caso de autos. "La enmienda que se introduce al efecto de añadir la frase 'o que adquirió el proyecto de viviendas' tiene el propósito de hacer extensivo el beneficio de la ley cuando se adquirieran propiedades de una persona natural o jurídica *que adquirió el proyecto para disponer por venta de las nuevas viviendas construidas.*" Informe de la Comisión de Conferencia del P. de la C. 1253 del 7 de noviembre de 1974.

Aquí Atlantic no adquirió el proyecto, sino simplemente tres (3) apartamentos de un total de ciento trece (113).

Correctamente la ilustrada sala sentenciadora consignó:

Hemos examinado el historial legislativo de las leyes 2 y 98, P. de la C. 1253 y P. del S. 1648, respectivamente, y entendemos que la intención del legislador *iba encaminada a la protección de la industria de la construcción, del capitalista, del desarrollador, de aquel que tenía el dominio real y control sobre la venta de todas y cada una de las distintas unidades del inmueble.* Dicha persona era la que en primer lugar se veía sustancialmente afectada por sus intereses económicos por la crisis prevaleciente. Tanto la Ley Núm. 2 que ofrecía exención a las propiedades hasta su venta, como los [*sic*] números 3 y 98, estaban encaminadas a promover mediante incentivo la compra de propiedades; tenían el propósito no sólo de evitar el descalabro económico de los proyectos ya terminados o comenzados, sino estimular el desarrollo de nuevos proyectos.

*En este sentido, un comprador que aisladamente adquiere tres, cinco, ocho unidades de vivienda, con el propósito de lucro o de asegurar una deuda, no es el constructor que quiso proteger el legislador, aunque éste haya construido* [sic] *la obra.* (Énfasis suplido.)

¿Cómo sostener que de ciento trece (113) apartamentos, la adquisición de tres (3) encaja dentro del concepto de "proyecto de viviendas"? No cabe duda de que Atlantic no cualifica bajo la ley.

Lamentablemente la sentencia de este Tribunal en grado apelativo confunde y mezcla la dinámica de los dos supuestos legales contemplados de adquisición directa.[1] El primero, del *dueño* que realizó la obra, sea o no el contratista de facto; y el segundo, de quien mediante compra previa adviene dueño del "proyecto de viviendas". Se logra así inventar una tercera alternativa híbrida. Nuestras leyes contributivas se

---

[1] A tal efecto se concluye que en "la venta del apartamento P.H. 1 al demandante no hubo solución de continuidad en la tradición directa de constructor a comprador de vivienda, se cumplió el propósito legislativo de favorecer al adquirente de una vivienda de nueva construcción de manos de la propia constructora". Y más adelante se expone que la ley no excluye al constructor de facto.

fundan en hechos y no en ficciones. Véase *Matos Balaguer* v. *Srio. de Hacienda*, 108 D.P.R. 858, 864 (1979). "El análisis integral de la operación es lo determinante." Íd., pág. 866. En este caso ese enfoque no favorece a los contribuyentes Hernández Mayoral. Desde el punto de vista jurídico no eran acreedores a esta exención.

Respecto a la disposición de la sala sentenciadora que los relevaba del pago de intereses y penalidades, por fundamentos distintos expuestos más adelante al discutir el discrimen político, coincidimos con dicha determinación.

*Solar en Calle Sol núm. 7, Ponce, agrupado al núm. 9*

Los esposos Hernández Mayoral son propietarios de un solar y edificación ubicada en la Calle Sol núm. 9 en Ponce. Desde el año 1962 tienen allí su residencia principal que está tasada en $11,170. Esta propiedad goza de exención contributiva concedida por la Ley Núm. 269 del 11 de mayo de 1949, según enmendada. 13 L.P.R.A. sec. 402.

El 21 de septiembre de 1973 el licenciado Hernández Colón, mediante escritura pública, recibió de sus progenitores, en donación pura y simple, un solar colindante de 340.57 m/c tasado en $3,010 y marcado con el núm. 7. En esa misma escritura el donatario Hernández Colón agrupó ambos solares. Subsiguientemente su padre, el Lcdo. Rafael Hernández Matos, como codonante, el 5 de octubre de 1973, remitió dicha escritura al Secretario de Hacienda en cumplimiento de la Ley de Contribuciones sobre Caudales Relictos y Donaciones. Acompañó también un recibo oficial de contribución de propiedad inmueble, correspondiente al año 1973-74 en que figura el solar con 330 m/c y tasado en $3,590 y varios documentos más. El licenciado Hernández Matos "suplic[ó] la más pronta liquidación de la responsabilidad contributiva toda vez que la inscripción de la donación está pendiente de despacho en el Registro". Sin embargo, para fines de la exención residencial contributiva, los esposos Hernández Mayoral no notificaron ni solicitaron ni reali-

zaron gestión directa alguna con el Departamento de Hacienda sobre esta agrupación.

El tribunal sentenciador sostuvo la determinación del Secretario de Hacienda respecto a una deficiencia contributiva sobre el solar donado.

La Ley Núm. 269 del 11 de mayo de 1949, según enmendada (conocida como Ley Núm. 24 de 1962), en lo pertinente reza:

*Para disfrutar de los beneficios de la exoneración del pago de contribuciones dispuesta por las secs. 402 a 404 de este título[,] será necesario probar* mediante *certificación* radicada con el Secretario de Hacienda de Puerto Rico o con el acreedor hipotecario en caso que lo hubiere, *en la forma* y fecha que el Secretario de Hacienda disponga, *que el contribuyente reúne los requisitos aquí establecidos haciendo* constar toda la información necesaria para que el Secretario de Hacienda pueda efectuar un cómputo correcto de la exoneración del pago de contribuciones autorizadas por esta sección. *Cualquier contribuyente que hubiere radicado la certificación a que se hace referencia en este párrafo vendrá obligado a notificar, según más adelante se dispone, cualesquier cambios en sus cualificaciones para disfrutar de la exoneración del pago de contribuciones aquí concedido y de cualesquier traspaso y modificaciones del dominio sobre la propiedad en relación con la cual hubiere radicado la referida certificación.* Si la propiedad garantiza un préstamo y el contribuyente viene obligado a depositar periódicamente con el acreedor hipotecario el importe de las contribuciones sobre la propiedad, el contribuyente radicará los cambios en las cualificaciones con el acreedor hipotecario quien a su vez lo notificará al Secretario de Hacienda. *En todos los demás casos los cambios en cualificaciones serán notificados directamente al Secretario de Hacienda.* En ambas alternativas los cambios en cualificaciones deberán radicarse en cualquier momento, con anterioridad al primero de enero siguiente a la fecha en que se efectuaron los cambios en dichas cualificaciones. (Énfasis nuestro.) 13 L.P.R.A. sec. 402.

La lectura de este precepto refleja que esta exención está concebida en dos supuestos: (1) las cualificaciones del dueño

de la propiedad y (2) la propiedad en sí, por su tasación, destino y uso. Claramente surge la obligación de todo contribuyente de notificar al Secretario de Hacienda "cualesquier cambios en sus cualificaciones . . . y de cualesquier traspaso *y modificaciones del dominio* sobre la propiedad en relación con la cual hubiere radicado la referida certificación".

El tribunal sentenciador correctamente concluyó que la ley requiere que el contribuyente notifique los cambios en el dominio. En cuanto a "la notificación hecha en virtud de la Ley sobre Caudales Relictos y Donaciones *no cumple los requisitos de la Ley Núm. 24 del 1962.* Aunque la División de Herencias y Donaciones y la División de Exención Contributiva están administrativamente bajo el Negociado de Tasación de la Propiedad, se trata de dos oficinas distintas: una se encarga del cómputo de las contribuciones sobre herencias y donaciones, y otra se encarga de verificar si una propiedad cualifica o no para las exenciones contributivas que como gracia legislativa concede el soberano. Es claro además que quien hizo la notificación antes aludida fue el donante[,] y la Ley '24', así como el Reglamento, requieren que sea *el contribuyente quien notifique* los cambios en su propiedad".

La exención concedida por esta ley no opera de propio derecho. Tampoco es automática ni absoluta. Dependiendo de ciertos factores puede ser total o parcial. Requiere de una solicitud al Secretario de Hacienda. "La ley puede ir más allá en el reconocimiento de la importancia de la voluntad del contribuyente: ésta puede, en efecto, *condicionar la aplicación de un beneficio fiscal a la petición del contribuyente de forma tal que, en defecto de la petición,* el impuesto se exija normalmente, mientras que ante tal *petición,* el impuesto *no* se exija total o parcialmente." A. Berliri, *Principios de Derecho Tributario,* Madrid, Ed. Derecho Financiero, 1971, Vol. II, pág. 318.

Otra vez la sentencia de este Tribunal hace caso omiso al mandato de ley que impone sobre el contribuyente el deber

de notificar cualquier modificación del dominio. Resuelve que en vista de que las tasaciones de ambas propiedades ($3,010 y $11,170) no exceden de $15,000, no se afectó "el estado contributivo de la residencia". El argumento es un *non sequitur*. Se queda trunco en lógica. Ciertamente la donación y agrupación registral no afectó la exención de la propiedad núm. 9. Eso no se discute. Pero ello no significa que por un proceso automático de aritmética la propiedad donada núm. 7, no exenta, fue absorbida e incorporada por la exención contributiva de la principal.

¿Puede decirse que no afecta el dominio de una propiedad el aumento de una cabida ascendente a 340.57 m/c? El concepto dominio "es la facultad que una persona tiene de usar y disponer libremente de lo suyo. Plenitud de los atributos que las leyes reconocen al propietario de una cosa para disponer de ella". I. Rivera, *Diccionario de Términos Jurídicos*, New Hampshire, Ed. Equity, 1976, pág. 78; *Municipio de Mayagüez* v. *Gómez et al.*, 15 D.P.R. 624, 640 (1909). En *WAPA* v. *Srio. de Hacienda*, 105 D.P.R. 816, 820 (1977), reconocimos la evolución que ha experimentado el concepto clásico de dominio hasta el presente. Hoy es amplio, "hace tiempo perdió la rigidez monolítica". ¿Cómo sostenerse entonces que no hay modificación en el dominio? ¿Puede excluirse un incremento en el valor de una propiedad cuando se agrupan dos solares colindantes? ¿No implica ello una clara alteración del dominio? Como toda exención en sí es una excepción al principio general de imposición contributiva, debe ser expresa y su interpretación *strictissimi juris*. R. Tamagno, *El Contribuyente*, Buenos Aires, Ed. Perrot, 1953, pág. 169.

Resumiendo, para fines contributivos la agrupación constituyó un acto que modificó el dominio de la propiedad en Sol núm. 9. Para hacer extensiva la exención a dicho solar donado era necesario una notificación y solicitud de los esposos Hernández Mayoral al Secretario de Hacienda. No lo hicieron. Debió confirmarse al tribunal de instancia en este extremo.

## III

Según antes indicáramos, el tribunal de instancia no resolvió ni se pronunció sobre la alegación de discrimen político. La sentencia de este foro, al anular las restantes contribuciones, evita evaluar este planteamiento al amparo de la Sec. 1 del Art. II de nuestra Constitución que propugna "[l]a dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. *No podrá establecerse discrimen alguno* por motivo de raza, color, sexo, nacimiento, origen o condición social, *ni ideas políticas* o religiosas . . .". (Énfasis suplido.) Además, priva tanto al contribuyente como a todos los funcionarios gubernamentales aludidos del beneficio de una adjudicación en sus méritos. Nuestra firme convicción de que proceden tales contribuciones nos obligan a examinarlo. Así debió haberlo hecho el foro de instancia. Estimamos que erró.

Los autos reflejan evidencia suficiente que, unida a las inferencias razonables, levantan una fuerte presunción de que se utilizaron indebidamente las leyes fiscales y la maquinaria del Departamento de Hacienda para discriminar y perseguir administrativamente a un adversario político. Hay serios indicios de que se ha violentado crudamente uno de los más preciados rasgos definidores de una democracia liberal, a saber, el "más amplio reconocimiento del derecho a diferir y ser, no obstante, tratado con igualdad y protegido en esa diferencia por el poder público". Informe de la Comisión de la Carta de Derechos, 4 Diario de Sesiones de la Convención Constituyente 2562 (1951). Examinemos estos indicadores.

Para la fecha en que el Departamento de Hacienda notificó e impuso las contribuciones sobre la propiedad al licenciado Hernández Colón, éste era candidato a la gobernación por el Partido Popular Democrático (P.P.D.). Faltaban escasamente tres (3) meses para las elecciones generales que se celebrarían el 4 de noviembre de 1980. La campaña política y los mensajes proselitistas estaban en su apogeo. El

Gobierno era administrado por el Partido Nuevo Progresista. Su principal opositor era el Primer Ejecutivo Carlos Romero Barceló, quien había designado al entonces Secretario de Hacienda, Julio César Pérez.

Curiosamente la investigación se origina en supuestas informaciones de prensa. La misma no fue una pesquisa rutinaria. No se inició por estar escrutándose el universo o una muestra de determinado grupo de contribuyentes, como tampoco una zona geográfica (distrito de catastro) en particular. Por el contrario, el Departamento de Hacienda la realizó sobre todos los inmuebles pertenecientes a quien era el más importante contendiente del Gobernador Romero Barceló. Esa singularización se adoptó *ex parte*, sin que el licenciado Hernández Colón fuera notificado. No se le proveyó oportunidad de exponer su posición, como tampoco de ventilar el asunto en una vista administrativa y producir evidencia a su favor.

El carácter sospechoso de una posible actuación administrativa de índole discriminatoria, selectiva y particularizada, tiende a evidenciarse a base de que no hemos encontrado ningún denominador común objetivo y neutral que sirviera de sostén racional para justificar la necesidad de una preferente y pronta investigación y su inmediata publicidad. Por el contrario, versó sobre exenciones provenientes de legislaciones y distritos catastrales diferentes. Las propiedades estaban en distritos distantes —Ponce, Guaynabo y San Juan. El único vínculo lógico detectable era la persona del contribuyente: Hernández Colón. Hasta ese momento ningún otro candidato a gobernador había sido sometido a ninguna o semejante investigación contributiva.

La investigación fue conducida sin notificación y dirigida desde el nivel central del Departamento de Hacienda. Como resultado, dicho departamento, sin citarlo ni oírle, canceló *todas* las exenciones que previamente le habían sido reconocidas. Procedió a imponerle las contribuciones.

Se siguió un medio de notificación peculiar y distinto. El

Departamento de Hacienda notificó por *mensajero* la deuda de contribuciones sobre la propiedad montante a $14,220.49 a las 4:00 p.m. del día 14 de julio de 1980. Ese mismo día el Lcdo. Ricardo Muñiz, Secretario Auxiliar de Rentas Internas del Departamento de Hacienda, emitió un Comunicado de Prensa, Radio y Televisión. Al otro día facilitó el informe a dichos medios. La simultaneidad de la comunicación al licenciado Hernández Colón y la conferencia de prensa anticipada para anunciar públicamente los resultados adversos a su persona levantan una fuerte suposición de que los verdaderos móviles envueltos fueron de índole partidista y que hubo una cuidadosa y coordinada planificación previa. De lo contrario, ¿qué razón había para este trato especial? ¿Por qué no pudo guardarse discreción y prudencia? ¿Cuál era la prisa?

El informe se entregó a la prensa el 15 de julio de 1980. Al otro día ésta destacó prominentemente la noticia. En la arena partidista los resultados adversos de esta forma de proceder y publicidad gubernamental administrativa no se hicieron esperar. A la semana, desde el 22 de julio de 1980, comenzaron a aparecer y circular anuncios auspiciados y pagados por el Partido Nuevo Progresista en los periódicos El Vocero y El Nuevo Día. Estos anuncios reproducían las aseveraciones del informe emitido por el Departamento de Hacienda. Le imputaban a Hernández Colón poseer "mansiones" y no querer pagar contribuciones sobre dichas propiedades. Otro apareció en la televisión. La secuencia fílmica concluía con la voz del Gobernador Romero Barceló, candidato oficial del Partido Nuevo Progresista a la reelección, diciendo: "Hernández Colón quiere volver a la Gobernación . . . ¿para qué?"

El Departamento de Hacienda justificó la investigación *ex parte* sobre la base de "interrogantes que fueran señaladas al Departamento a través de la prensa del país". Sin embargo, adoptó este singular curso de acción para cancelar todas las exenciones e ignoró sus propias prácticas adminis-

trativas que de ordinario permiten a los contribuyentes obtener remedios administrativos. ¿Era anticipable que sus adversarios políticos usufructuaran todo este proceder administrativo? ¿Quién dio la orden para que se investigara? ¿Quién instruyó que se diera inmediatamente a la publicidad? Todas estas interrogantes debieron dilucidarse en el juicio plenario. La seriedad del asunto lo amerita. Lo menos que surge es una preocupación de falta de tacto y sensibilidad; lo más, una carencia de espíritu democrático y de tolerancia política hacia un líder opositor de un partido principal.

En las circunstancias apuntadas los tribunales han diseñado una prueba basada en dos elementos para evaluar este tipo de caso: (1) examinar si de ordinario personas en circunstancias análogas a las del ciudadano o contribuyente investigado o procesado han sido desatendidas por el Gobierno; y (2) indagar si la base para esa actuación o conducta administrativa responde a criterios proscritos —*United States* v. *Berrios,* 501 F.2d 1207, 1208-1211 (2nd Cir. 1974)— ([2]) tales como persecución por razones políticas o de sexo, raza y nacimiento.

Bajo esta fórmula lo esencial es probar que la selección individual estuvo viciada por un ejercicio discrecional indebido, motivada por criterios ajenos a una sana y establecida política pública administrativa. La ausencia de rutina o método objetivo y neutral en la actuación gubernamental tiende a apoyar que ese discernimiento respondió a consideraciones constitucionales vedadas.

En el caso de autos la prueba presentada por los esposos Hernández Mayoral en apoyo de la sentencia sumaria suscita robustas sospechas de un ejercicio de discreción y aplicación arbitraria y discriminatoria de las leyes fiscales por razones

---

([2]) Véanse además, *United States* v. *Bourque,* 541 F.2d 290 (1st Cir. 1976); *United States* v. *Murdock,* 548 F.2d 599 (5th Cir. 1977); *United States* v. *Hazel,* 696 F.2d 473 (6th Cir. 1983); *United States* v. *Peskin,* 527 F.2d 71 (7th Cir. 1975), *cert.* den. 429 U.S. 818 (1976); *United States* v. *Ojala,* 544 F.2d 940 (8th Cir., 1976); *United States* v. *Scott,* 521 F.2d 1188 (9th Cir. 1975), *cert.* den. 424 U.S. 955 (1976); *State* v. *Holloway,* 460 A.2d 976 (Del. Super. 1983).

político-partidistas. Los siguientes signos están presentes: su posición de principal contendiente a la gobernación; el momento escogido —cercano a las elecciones— para proceder con la investigación fiscal; la forma en que se inició y notificó; el destaque publicitario y negativo que el Departamento de Hacienda le inyectó; los funcionarios que la dirigieron y demás circunstancias.

A manera de epílogo, resta resolver qué remedio cabría si el tribunal de instancia resolviera que medió discrimen por razón de ideas políticas en la investigación contributiva que nos ocupa.

De un lado, tenemos nuestro criterio de que proceden confirmarse las contribuciones sobre el apartamento P.H. 1 (oeste) del Condominio Belén y el solar donado de la Calle Sol núm. 7, Ponce, Puerto Rico. Y del otro, un repudio por los móviles y métodos gubernamentales de esta naturaleza. De probarse en su día, ¿cómo entonces disuadir este tipo de discrimen sin perjudicar el fisco?

Ante este dilema, el remedio tendría que curar en su etiología la enfermedad. La solución judicial que se impondría —sin menoscabo de la potencial causa de acción en daños que directamente tiene todo ciudadano contra aquellos funcionarios gubernamentales que actúan so color de autoridad, de mala fe, ilegal y con claro menosprecio a los derechos constitucionales— sería anular la notificación de las contribuciones y, claro está, todo reclamo de intereses y penalidades. (³)

Este remedio no impediría que el Secretario de Hacienda otra vez notificara las mismas observando el debido proceso de ley, reglamento y procedimiento administrativo. En principio subsistiría la responsabilidad contributiva de los esposos Hernández Mayoral en lo que respecta al apartamento

---

(³) Deben imponerse otras medidas drásticas para atacar el mal producido por el patronazgo, despojo y desquite partidista (*spoil system*). Para alternativas que frenarían este proceder, véase la opinión concurrente en *Caballero* v. *Romero Barceló*, 113 D.P.R. 1 (1982).

P.H. 1 del Condominio Belén, Guaynabo y del solar donado núm. 7 de la Calle Sol, (⁴) Ponce, Puerto Rico, pero sin intereses ni penalidades.

Únicamente así hacemos realidad el ideal democrático de "convivir con el opositor y darle plena oportunidad para que en el debate político cambie de crítico en dirigente cuando gane la confianza electoral [. De ahí] deriva buena parte de su fuerza creadora y renovadora. Es éste el único régimen que se complace en el vigor fecundante de las diferencias mantenidas en el marco de una lealtad básica a los principios y a la metodología de la democracia. Las diferencias y los conflictos no perturban la solidaridad de los seres humanos en el bien común sino que, por el contrario, la fortalece y afianza". 4 Diario de Sesiones, *supra*, 2562–2563 (1951).

Debió devolverse el caso para la continuación del proceso compatible con lo aquí expuesto.

—O—

Voto disidente separado emitido por el Juez Asociado Señor Rebollo López.

La Sec. 1 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico dispone que la "dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. *No* podrá establecerse *discrimen alguno* por motivo de

---

(⁴) En los autos hay una declaración jurada de Luis R. Hernández, ex jefe de la División de Exenciones Contributivas y Apelaciones del Negociado de Tasación de la Propiedad (hoy Contribución sobre la Propiedad y Herencia), en que se acredita la práctica administrativa de admitir tardíamente solicitudes de exoneración de contribuyentes que de buena fe y bajo juramento demostraban la adquisición y uso ininterrumpido de la propiedad, apoyado en certificaciones de suministro continuo de agua y electricidad.

Esta buena y justiciera práctica administrativa se desarrolló al amparo de la disposición del Art. 7(c), Sec. 3 del Reglamento aplicable:

"Las certificaciones radicadas después de vencidos los términos aquí prescritos, podrán ser rechazadas por el Secretario de Hacienda a menos que se demuestre a satisfacción de dicho funcionario que circunstancias extraordinarias impidieron la radicación y archivo de la certificación oportunamente."

En esta etapa carecemos de elementos de juicio para dictaminar su procedencia respecto al solar en Ponce. No prejuzgamos la cuestión.

raza, color, sexo, nacimiento, origen o condición social, *ni ideas políticas* o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana". (Énfasis suplido.)

Al discutirse el alcance de la cláusula constitucional citada en el seno de la Convención Constituyente se vertieron, en lo pertinente, expresiones como las siguientes:

.    .    .    .    .    .    .    .    .

*Ideas políticas o religiosas*: Se reconoce el derecho a tener ideas políticas y convicciones religiosas diferentes y en conflicto entre sí *sin que esta diferencia o este conflicto milite en favor o en contra de ciudadano alguno en sus relaciones con el Estado*. La libertad de pensamiento y la libertad de conciencia quedan aquí protegidas no sólo en su expresión sino también en las consecuencias de esta expresión.

.    .    .    .    .    .    .    .    .

El más amplio reconocimiento del derecho a diferir *y ser, no obstante, tratado con igualdad y protegido en esa diferencia por el poder público*, es uno de los rasgos definidores de la democracia liberal. (1) (Énfasis suplido.)

En *Clemente v. Depto. de la Vivienda*, 114 D.P.R. 763 (1983) —caso en que revocamos la sentencia desestimatoria de la demanda emitida por el tribunal de instancia *y en que devolvimos el mismo al mencionado foro* para que dilucidara la alegación, por parte del demandante, de que se le despidió de su empleo por razón de discrimen político— expresamos que en "el pasado hemos sido muy celosos y rigurosos en nuestra fundamental tarea de proteger la libertad ideológica contra gestiones represivas del Estado o algunos de sus funcionarios", que el "lenguaje del citado Art. II, Sec. 1, de nuestra Constitución es expreso, claro e inequívoco; prohíbe, y protege a un ciudadano contra *toda* clase de discrimen", y que dicho lenguaje sencillamente "garantiza el disfrute de la libertad ideológica a que tiene derecho todo invididuo en una sociedad democrática como la nuestra". Págs. 767, 768.

---

(1) 4 Diario de Sesiones de la Convención Constituyente 2562 (1951).

Igual posición y solución se impone en el presente caso. Se trata de un *supuesto* acto de persecución política que *alegadamente* desemboca en una investigación de los asuntos fiscales de un ciudadano por parte del Departamento de Hacienda de Puerto Rico con la consabida consecuencia de la notificación de deficiencias contributivas.

Al ser notificado de las deficiencias, el ciudadano acude a los tribunales de justicia haciendo la alegación —"basada" la misma en hechos específicos— de que la investigación fiscal realizada estuvo políticamente motivada.

Ciertamente dicho contribuyente tenía derecho, al igual que el empleado público que alega que es despedido debido a discrimen político, a que el tribunal de instancia dilucidara la referida alegación. Si alguna importancia de *tipo jurídico* tiene este caso es el planteamiento del demandante sobre *posible* persecución política; el hecho de si el contribuyente adeuda o no las alegadas deficiencias es secundario.

Naturalmente que el Gobierno de Puerto Rico y los funcionarios a los que se hace alusión en la demanda también tienen derecho, ante una alegación y "prueba" de esa naturaleza, a que se les brinde la oportunidad de refutar la evidencia que presente el contribuyente. El dilucidar dicho planteamiento constituía la primera prioridad del tribunal de instancia. Erró al no hacerlo así.

Este Tribunal, sin embargo, en su empeño por no "detener [su] acción revisora" pasa por alto y se olvida de que en el presente caso no se ha celebrado un juicio plenario. El mismo fue resuelto por el tribunal de instancia al amparo del procedimiento de sentencia sumaria que establece la Regla 36 de las de Procedimiento Civil. Lo que existe en el expediente del caso respecto a las cuestiones en controversia es meramente unas alegaciones y un "ofrecimiento de prueba" por parte del demandante y la correspondiente "refutación" por parte del Departamento de Hacienda de Puerto Rico. Por mandato expreso de la propia Regla 36 *no* procedía que se dictara sentencia sumaria por cuanto existe una

"controversia real sustancial" en cuanto a hechos materiales en el presente caso. Incidió el tribunal de instancia al así dictarla.

No hay duda de que, *de ser cierto lo alegado por el contribuyente,* la acción del Departamento de Hacienda de Puerto Rico merece nuestro más enérgico repudio. Igualmente objetable a nuestro sistema democrático de gobierno, sin embargo, resulta ser la acción de este Tribunal que, al "opta[r] por adjudicar el recurso dentro de estricto Derecho contributivo" impide que se resuelva la imputación de supuesta persecución política, dejando en el limbo la cuestión; cometiéndose de ese modo una injusticia no sólo con el contribuyente, que tiene perfectísimo derecho a que un tribunal de justicia adjudique su alegación, sino con los funcionarios públicos contra los cuales va dirigida la imputación en controversia, cuya reputación queda "manchada" para siempre, negándosele la oportunidad a éstos de tener su "día en corte" y de demostrar que lo alegado por el contribuyente es falso.

Por último, y en vista de todo lo anteriormente expresado, somos del criterio de que en esta etapa de los procedimientos es total y completamente improcedente no sólo que este Tribunal se exprese sobre la corrección o incorrección de las determinaciones fiscales realizadas en el presente caso por el Departamento de Hacienda de Puerto Rico, sino que es igualmente improcedente que nos expresemos sobre si la "prueba ofrecida" por el demandante en apoyo de su alegación de persecución política es suficiente o no y cuáles deben ser las consecuencias de ello en la alternativa de que se concluyera que efectivamente hubo discrimen político. Es obvio que en estos momentos no estamos en la mejor posición para pasar juicio sobre ello. No debemos prejuzgar las cuestiones en controversia. Debemos recordar que nuestra función es eminentemente revisora y el presente caso no ha sido dilucidado en los méritos.

Por las razones expresadas revocaría la sentencia dictada por el tribunal de instancia y devolvería el caso a ese foro

con instrucciones de que señale una vista donde deberá evaluar la prueba que ambas partes tengan a bien presentar respecto a todos los asuntos en controversia, luego de lo cual deberá emitir la sentencia que dicho foro entienda procedente en Derecho.

—O—

Voto separado del Juez Asociado Señor Dávila.

Entiendo que lo que procede en este caso es dejar sin efecto la sentencia y devolverlo a instancia, ya que el ofrecimiento de prueba hecho por los contribuyentes demandantes amerita que se les provea oportunidad de continuar con el procedimiento ordinario en instancia. La posición política del contribuyente, el momento cercano a las elecciones en que se procedió con la investigación fiscal, la forma en que ésta fue iniciada, el destaque que le proveyó el Departamento de Hacienda, los funcionarios que la dirigieron, son alegaciones suficientes para requerir una oportunidad de prueba. Toda vez que la única controversia a ser resuelta por el tribunal sentenciador es si ha mediado discrimen por razón de ideas políticas en la investigación contributiva de los contribuyentes demandantes y en la subsiguiente notificación de impuestos, el Tribunal Superior, luego de concluido el proceso, deberá reinstalar su sentencia de 13 de setiembre de 1982 en caso de que entienda que no ha mediado irregularidad en el proceso fiscal de autos o deberá anular la notificación de impuestos de demostrarse, en contrario, que la misma obedece a un procedimiento inconstitucional.

Se serviría muy mal al interés tributario del Estado si se le diera curso a procedimientos contributivos discriminatorios. Se destruiría la confianza del pueblo en la imparcialidad del proceso colector, generando animosidad contra el fisco y, por ende, agravando la gestión impositiva. La tarea judicial de interpretación de las leyes contributivas se vería inmensamente entorpecida. Como este caso demuestra, tras

la controversia sobre discrimen político suele haber otra sobre interpretación de Derecho contributivo. El Derecho contributivo es muchas veces complejo y difícil; como en tantas otras áreas de derecho, la certeza no lo caracteriza.

Ante estas circunstancias, las interpretaciones que de las leyes fiscales haga el Departamento de Hacienda, que las administra, pueden ser de útil ayuda en casos apropiados para el tribunal. El proceso se vicia, sin embargo, cuando la agencia no ha hecho una interpretación *bona fide*, sino movida por un interés ilegítimo.