EL PUEBLO DE PUERTO RICO, apelado, *v.* LUIS LAUSELL HERNÁNDEZ, acusado y apelante.

*Número:* CR-86-68     *Resuelto:* 30 de junio de 1988

824

*Héctor Lugo Bougal, Arnaldo Granados Estrada, Guillermo J. Ramos Luiña y José S. Brenes-La Roche,* abogados del apelante; *Rafael Ortiz Carrión, Procurador General, Josefa A. Román García y María Adaljisa Dávila, Procuradoras Generales Auxiliares,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Valoramos los méritos de la presente apelación reconociendo las dificultades que entraña la misión de juzgar a nuestros semejantes. Al adjudicar la conducta del apelante Luis A. Lausell Hernández, no ignoramos el atributo de compasión justificada. Sin embargo, frente a su postura extrema, como juristas no podemos sacrificar intereses públicos de alta estima en el ámbito social y comunitario. "Creer —dice— que la autoridad justa es la que instaura un orden justo en todos los puntos, es el camino de las locuras más peligrosas; la autoridad es justa cuando da ejemplo de justicia en todas las actuaciones, lo que ya es bien difícil. Las ilusiones que se sustentan desembocan lógicamente en el absurdo de una sociedad donde todo será justo sin que nadie tenga que serlo." Bertrand De Jouvenel, citado por J.B.

Vallet De Goytisolo, *Estudios sobre fuentes del Derecho y método jurídico*, Madrid, Ed. Montecorvo, 1982, pág. 165.

## I

■ Ante el Tribunal Superior, Sala de San Juan, Lausell Hernández fue acusado de ilegal, a sabiendas, con intención criminal y *voluntariamente*, no rendir al Secretario de Hacienda las planillas de contribución sobre ingresos correspondientes a los años 1981, 1982 y 1983, a pesar de haber devengado ingresos brutos en exceso de $2,000 como empleado de la Autoridad de Energía Eléctrica, Presidente de la Unión de Trabajadores de la Industria Eléctrica y Riego (U.T.I.E.R.) y arrendador de una propiedad. Sec. 145 de la Ley de Contribuciones sobre Ingresos de 1954.(1)

Con la anotación de alegaciones de no culpable, luego del juicio en su fondo, un jurado rindió veredicto de culpabilidad. El Ministerio Fiscal solicitó la imposición de una pena severa por circunstancias agravantes. Adujo que la prueba desfilada reveló que en abril de 1984 Lausell Hernández rompió sus planillas públicamente frente al edificio del Departamento de Hacienda, hizo caso omiso a los requerimientos administrativos previos de que las rindiera, exhortó a otros a emularlo y, reiteradamente, retó a los funcionarios públicos a que lo encausaran criminalmente. Según el Ministerio Fiscal, ello evidenciaba una conducta antisocial, carente de un espíritu de arrepentimiento y de ánimo rehabilitador. Oportunamente, el tribunal tuvo ante sí un informe presentencia favo-

---

(1) Dispone que:

"Cualquier persona obligada bajo este subtítulo a rendir una planilla o declaración que *voluntariamente* dejare de rendir dicha planilla o declaración, dentro del término o términos fijados por ley o por reglamentos, en adición a otras penalidades provistas por ley, será culpable de un delito grave y castigada con multa no menor de quinientos (500) dólares ni mayor de diez mil (10,000) dólares o reclusión por un término no menor de seis (6) meses ni mayor de cinco (5) años, o ambas penas, más las costas del proceso." 13 L.P.R.A. sec. 3145(c).

rable, expositivo de que, con excepción de no haber rendido dichas planillas —ni la de 1985, hecho que no tomaría en cuenta— su evaluación social era positiva en todas las áreas. El Fiscal se opuso a que le suspendieran los efectos de la sentencia y reprodujo los hechos antes relatados como agravantes.

Previa vista, el tribunal (Hon. Daniel E. López Pritchard, Juez) lo sentenció en cada cargo *a tres (3) años de presidio,* a cumplirlos concurrentemente. Se negó a suspender las sentencias, aunque dispuso que concedería ese beneficio si dentro del término de noventa (90) días Lausell Hernández rendía sus planillas.

No conforme, en apelación discute como únicos señalamientos que la prueba no demostró intención criminal y, además, señaló que erró el foro de instancia al negarse a citar compulsoriamente al entonces Contralor de Puerto Rico, Ramón Rivera Marrero. Ambos apuntamientos exigen una breve referencia a la evidencia desfilada.

## II

Conforme las estipulaciones acordadas, testimonios y documentos, la prueba de cargo contundentemente demostró que Lausell Hernández cumplió con su obligación de rendir las planillas de 1978, 1979 y 1980. Sin embargo, no rindió las correspondientes a 1981, 1982 y 1983, aun cuando generó ingresos anuales —en concepto de salarios combinados con su esposa y rentas— en exceso de $2,000. Como a todo empleado asalariado, su patrono la Autoridad de Energía Eléctrica le retuvo en su origen ciertas cantidades para cubrir su responsabilidad contributiva conforme a la legislación, reglamentación y tablas de retención fiscal entonces vigentes. Se produjo en evidencia un artículo del periódico *El Vocero* referente a su protesta pública —de 19 de abril de 1984— ilustrativo de que había roto sus planillas frente al edificio del Departamento de Hacienda.

Se probó, además, que Lausell Hernández fue citado a Fiscalía con el propósito de que cumpliera con su responsabilidad contributiva y que fue infructuoso exhortarle que rindiera sus planillas. No obstante esta oportunidad, *consciente y voluntariamente, rechazó ese curso de acción y retó a que lo acusaran.* Después informó que no rendiría las planillas de 1984 y 1985.(2) E.N.P., pág. 7.

Por su parte, Lausell Hernández, a través de su esposa, presentó prueba de que su conducta fue una protesta autoinspirada para dramatizar su señalamiento —coincidente con los del Contralor Rivera Marrero— de que en aquella época el Gobierno estaba malgastando un promedio anual de $600 millones de fondos públicos en detrimento de una mejoría de las condiciones físicas de los planteles escolares y apartamentos de viviendas que sirven a la clase trabajadora del país. A tal efecto, sometió en evidencia varios informes finales de la Oficina del Contralor y numerosas fotografías. E.N.P., págs. 12–13. También atestó a su favor el Lic. Carlos L. Clausell Reyes, ex funcionario de vasta experiencia del Departamento de Hacienda, quien atestiguó que por años la práctica fue no acudir a los tribunales, sino tratar de solucionar el problema administrativamente. Se le notificaba al contribuyente la deficiencia y, si éste se negaba, podía llenársele la planilla "de oficio", al amparo de la Sec. 416 de la Ley de Contribuciones sobre Ingresos de 1954 (13 L.P.R.A. sec. 3416). Como en la mayoría de los casos los aceptaban los contribuyentes administrativamente, muy pocos llegaban a los tribunales. E.N.P., págs. 15–16. Aclaró, sin embargo, que no conocía de ninguno previo en que el contribuyente hubiese roto sus planillas. E.N.P., pág. 18.

---

(2) Subsiguientemente rindió la planilla del año natural 1984, pero no pagó las contribuciones.

## III

Fundado en que su comportamiento constituyó una protesta contra el mal uso de fondos públicos, Lausell Hernández argumenta su primer señalamiento. Sostiene que "su infracción a la Ley de Contribución Sobre Ingresos, forma parte de una concertada y estratégica acción con *incuestionables méritos sociales,* en donde *la intención para defraudar al Estado no está presente".* (Énfasis suplido.) Alegato del acusado-apelante, pág. 3. A esos efectos, adelanta la tesis de que el Fiscal no demostró el elemento de intención criminal, pues aunque sí se probó que efectivamente *no* rindió las planillas, "ese hecho hay que evaluarlo a la luz de la situación política y social imperante en Puerto Rico a principios [de la década] de los 80, así como la posición del liderato político que ejercía" como candidato a la gobernación por el Partido Socialista Puertorriqueño. Aduce que durante ese periodo "existía la opinión generalizada de que el gobierno no estaba utilizando sus recursos eficientemente. Que la casa pública no estaba siendo administrada con responsabilidad. El propio Contralor de Puerto Rico, señor Ramón Rivera Marrero[,] fue citado por los periódicos del país como recomendando al pueblo de Puerto Rico a que se organizara en un movimiento de protesta y se negara a pagar sus contribuciones, toda vez que el presupuesto del gobierno se estaba despilfarrando".(3)

---

(3) Nos remite, en detalle, a un artículo del periódico *El Vocero* de 30 de octubre de 1984, que en lo pertinente expone:

"El Contralor Ramón Rivera Marrero recomendó ayer al pueblo de Puerto Rico, *a que se organice en un movimiento de protesta* y dé a conocer al gobierno que no está dispuesto a permitir que los fondos públicos sean utilizados en forma ilegal. Rivera Marrero dijo que está cerca el día que el pueblo dirá al gobierno que no pagará contribuciones para ser mal usadas . . . . Las expresiones del Contralor se producen en momentos en que las palabras corrupción y escándalos han sido profusamente utilizadas por líderes políticos durante la campaña electoral . . . . Rivera Marrero ha denunciado que el 10% del presupuesto del

■ Bajo este enfoque nos indica que el incumplimiento legal de rendir sus planillas no obedeció a una intención para defraudar al Estado. A juicio suyo el Ministerio Público no probó más allá de duda razonable que medió intención criminal, es decir, un propósito perverso, sin excusa razonable, caracterizado por descuido o irresponsabilidad y constitutivo de un abandono del deber social. *United States v. Murdock*, 290 U.S. 389, 398 (1933); *Spies v. United States*, 317 U.S. 492, 498 (1943). No tiene razón.

En *Pueblo v. Calzada*, 93 D.P.R. 803, 804–805 (1966), nos referimos al requisito de *conducta voluntaria* como "deferencia a la disposición constitucional que rechaza el encarcelamiento por deuda, Art. II, Sec. 11 de la Constitución" y elucidamos sobre la variedad de su significado. Un examen de la casuística federal de entonces nos llevó a concluir que la voluntariedad como elemento esencial del delito "requiere la existencia de una intervención específica de lesionar —*con motivo perverso*— . . .". *Pueblo v. Calzada*, supra, pág. 806.

Ciertamente, bajo la jurisprudencia federal invocada, los tribunales han resuelto en reiteradas ocasiones que el Estado debe probar, no sólo que el ciudadano tenía la obligación de rendir la planilla, sino que la omisión fue de carácter intencional. Así, un ciudadano que conozca su obligación legal, pero carezca de fondos, podría no estar cometiendo el delito. *Liparota v. United States*, 471 U.S. 419, 426–427 (1985).

■ Aunque *originalmente* los tribunales de apelación federales —*United States v. Palermo*, 259 F.2d 872 (3er Cir. 1958); *Abdul v. United States*, 254 F.2d 292 (9no Cir. 1958)— adoptaron el requisito de que esta intención fuese inspirada por un propósito perverso (*evil motive*), siguiendo lo pau-

---

gobierno se despilfarra o es mal usado, estimando la cifra en unos 600 millones. Rivera Marrero sostuvo que los puertorriqueños *deben imitar al contribuyente americano que ha protestado por la forma que* el gobierno [de] Estados Unidos maneja los fondos públicos . . . ." (Énfasis suplido.) *Exhibit* II.

tado en *United States v. Murdock*, supra, la cuestión fue esclarecida *subsiguientemente* cuando el Tribunal Supremo federal, en *United States v. Pomponio*, 429 U.S. 10, 12 (1976), pautó la norma de que no era menester probar motivación perversa o propósito avieso, *sino tan sólo la intención de violentar un deber legal*.

Bajo este prisma decisorio, aunque aceptemos que su motivación no fue la de defraudar al erario —y sí dar fuerza a una denuncia cívica sobre malversación de fondos públicos y corrupción— por noble que sea no basta por sí sola para derrotar la configuración de intención a base de las circunstancias que rodean el caso particular. *Pueblo v. Calzada*, supra. El error no fue cometido.

IV

■ En su segundo señalamiento, Lausell Hernández cuestiona la negativa del tribunal de instancia a citar compulsoriamente al Contralor Rivera Marrero como su testigo. Aduce que ello violó el derecho constitucional consignado en el Art. II, Sec. 11 de nuestra Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, págs. 307–308, que dispone:

> En todos los procesos criminales, el acusado disfrutará del derecho a un juicio rápido y público, a ser notificado de la naturaleza y causa de la acusación recibiendo copia de la misma, a carearse con los testigos de cargo, *a obtener la comparecencia compulsoria de testigos a su favor*, a tener asistencia de abogado, y a gozar de la presunción de inocencia. (Énfasis suplido.)

■ En *Pueblo v. Acosta Escobar*, 101 D.P.R. 886, 890 (1974), hicimos un recuento del desarrollo jurisprudencial preconstitucional en torno a la comparecencia obligada de testigos y concluimos que se trataba de "una facultad discrecional". Recientemente, en *Pueblo v. Burgos Hernández*, 113 D.P.R. 834, 839 (1983), reiteramos esa normativa y expu-

simos que este derecho podría ser atemperado "si las circunstancias lo ameritan". Examinemos las aquí presentes.

■ Es claro que el propósito de citar al Contralor Rivera Marrero era probar el contenido de los *informes* de dicho funcionario y sus manifestaciones como puntal de la cruzada pública de Lausell Hernández contra el uso indebido de fondos públicos. Al analizar notamos que la negativa del tribunal estuvo fundada en una solicitud y declaración jurada suscrita por el Contralor Rivera Marrero, acreditativa de que: (1) no conocía a Lausell Hernández; (2) nunca lo había investigado ni intervenido; (3) no tenía conocimiento alguno —personal u oficial— de los hechos alegados en las acusaciones, y (4) las funciones de su cargo no conllevaban fiscalizar o intervenir con el deber ciudadano de rendir planillas de contribución sobre ingresos. En resumen, que su testimonio carecía de materialidad, pertinencia y relevancia. Bajo esta circunstancia, correctamente el foro de instancia concluyó:

> Establecida la autoridad del Tribunal para exonerar o excluir a un testigo de la comparecencia obligatoria constitucional; analizada la moción a que hemos hecho referencia y radicada por el Contralor de Puerto Rico; examinado el memorando de derecho en apoyo de la solicitud para que se excuse como testigo al Contralor de Puerto Rico, radicado en autos el 4 de marzo de 1986; tomando en consideración la declaración prestada por el Lcdo. Carlos Clausell Reyes, que ha ocupado la silla testifical, y cuyo testimonio ha sido objeto del interrogatorio directo y repregunta; y tomando en consideración las expresiones contenidas en la teoría de la defensa, se concluye por el Tribunal que procede la aplicación al caso de autos de las disposiciones de la Regla 19, de las Reglas de Evidencia del Tribunal Supremo de Puerto Rico, donde se establece la autoridad del Tribunal para eximir o establecer por razones de economía procesal y de justicia si es indispensable o no la comparecencia de un testigo, particularmente cuando su presentación sería prueba de carácter acumulativo.
>
> Entiende el Tribunal que el señor imputado tiene todos los medios de prueba suficientes para exponer y sostener, hasta

donde la ley lo autoriza, la teoría de desobediencia civil que se ha expuesto en su teoría de defensa y que el Contralor de Puerto Rico no es un testigo indispensable para estos fines . . . .

. . . Se toma en consideración, además, el hecho de que el Contralor le ha suplido a la defensa toda la prueba documental y los informes de investigaciones del Contralor que se solicitaron. Estos informes contienen mucha de la información que se desea por la defensa que exprese oralmente, en presencia de las damas y caballeros del jurado, el Sr. Ramón Rivera Marrero.

Los informes del Contralor aludidos fueron presentados en evidencia.

## V

En resumen, no tiene razón Lausell Hernández en sus dos (2) planteamientos. Tampoco procede su absolución bajo el prisma de discrimen por razones políticas. Ni siquiera lo señala como error. A lo sumo, sólo sugiere que fue injustamente acusado porque su protesta social, de generalizarse, "menoscabaría la capacidad del gobierno para llevar a cabo sus programas".

Examinemos someramente la cuestión. Salta a la vista que la presente situación de hecho no se asemeja ni remotamente se aproxima al trasfondo del caso de *Hernández Colón v. Srio. de Hacienda*, 115 D.P.R. 145 (1984), único en nuestra jurisprudencia en que se ha discutido frontalmente este aspecto. No son comparables. El denominador común reconocible de que *ambos eran candidatos a la gobernación* no es suficiente. Ahí termina toda analogía fáctica.[4]

---

[4] Véanse las opiniones disidentes individuales de los Jueces Asociados Señores Negrón García y Rebollo López.

Según surge de la primera, allí se demostró que para "la fecha en que el Departamento de Hacienda notificó e impuso las contribuciones sobre la propiedad al licenciado Hernández Colón, éste era candidato a la gobernación por el

En síntesis, a base de los hechos allí presentes, a saber, la posición del licenciado Hernández Colón como principal con-

---

Partido Popular Democrático (P.P.D.). Faltaban escasamente tres (3) meses para las elecciones generales que se celebrarían el 4 de noviembre de 1980. La campaña política y los mensajes proselitistas estaban en su apogeo. El Gobierno era administrado por el Partido Nuevo Progresista. Su principal opositor era el Primer Ejecutivo Carlos Romero Barceló, quien había designado al entonces Secretario de Hacienda, Julio César Pérez.

*"Curiosamente la investigación se origina en supuestas informaciones de prensa. La misma no fue una pesquisa rutinaria. No se inició por estar escrutándose el universo o una muestra de determinado grupo de contribuyentes, como tampoco una zona geográfica (distrito de catastro) en particular.* Por el contrario, el Departamento de Hacienda la realizó sobre todos los inmuebles pertenecientes a quien era el más importante contendiente del Gobernador Romero Barceló. *Esa singularización se adoptó ex parte, sin que el licenciado Hernández Colón fuera notificado. No se le proveyó oportunidad de exponer su posición, como tampoco de ventilar el asunto en una vista administrativa y producir evidencia a su favor."* (Énfasis suplido.) *Hernández Colón v. Srio. de Hacienda,* 115 D.P.R. 145, 162–163 (1984).

Dijimos, además, que el "carácter sospechoso de una posible actuación administrativa de índole discriminatoria, selectiva y particularizada, tiende a evidenciarse a base de que no hemos encontrado ningún denominador común objetivo y neutral que sirviera de sostén racional *para justificar la necesidad de una preferente y pronta investigación y su inmediata publicidad.* Por el contrario, versó sobre exenciones provenientes de legislaciones y distritos catastrales diferentes. Las propiedades estaban en distritos distantes —Ponce, Guaynabo y San Juan. El único vínculo lógico detectable era la persona del contribuyente: Hernández Colón. *Hasta este momento ningún otro candidato a gobernador había sido sometido a ninguna o semejante investigación contributiva.*

"La investigación fue conducida sin notificación y dirigida desde *el nivel central* del Departamento de Hacienda. Como resultado, dicho departamento, *sin citarlo ni oírle,* canceló *todas* las exenciones que previamente le habían sido reconocidas. Procedió a imponerle las contribuciones.

*"Se siguió un medio de notificación peculiar y distinto.* El Departamento de Hacienda notificó por *mensajero* la deuda de contribuciones sobre la propiedad montante a $14,220.49 a las 4:00 p.m. del día 14 de julio de 1980. Ese mismo día el Lcdo. Ricardo Muñiz, Secretario Auxiliar de Rentas Internas del Departamento de Hacienda, *emitió un Comunicado de Prensa, Radio y Televisión. Al otro día facilitó el informe a dichos medios.* La simultaneidad de la comunicación al licenciado Hernández Colón y la conferencia de prensa anticipada para anunciar públicamente los resultados adversos a su persona levantan una fuerte suposición de que *los verdaderos móviles envueltos fueron de índole partidista y que hubo una cuidadosa y coordinada planificación previa.* De lo contrario, ¿qué razón había para este trato especial? ¿Por qué no pudo guardarse discreción y prudencia? ¿Cuál era la prisa?

tendiente a la gobernación; el momento escogido por el Departamento de Hacienda para proceder a la investigación fiscal en fecha cercana a las elecciones generales; la ausencia de criterio imparcial o muestra rutinaria de grupos de contribuyentes; la forma selectiva y particular en que se inició la investigación; la adopción *ex parte* de las deficiencias sin dársele la oportunidad de exponer su posición o ventilar el asunto administrativamente, y la manera en que sus resultados fueron informados al público —coetáneamente con un destaque publicitario negativo sin precedentes— detectamos una actuación del Departamento de Hacienda que resulta discriminatoria e impermisible constitucionalmente.

■ En el caso de autos, la situación no sólo es completamente diferente, sino a la inversa. Fue el propio apelante

---

"El informe se entregó a la prensa el 15 de julio de 1980. Al otro día ésta destacó prominentemente la noticia. En la arena partidista los resultados adversos de esta forma de proceder y publicidad gubernamental administrativa no se hicieron esperar. A la semana, desde el 22 de julio de 1980, comenzaron a aparecer y circular anuncios auspiciados y pagados por el Partido Nuevo Progresista en los periódicos [*El Vocero*] y [*El Nuevo Día*]. Estos anuncios reproducían las aseveraciones del informe emitido por el Departamento de Hacienda. Le imputaban a Hernández Colón poseer 'mansiones' y no querer pagar contribuciones sobre dichas propiedades. Otro apareció en la televisión. La secuencia fílmica concluía con la voz del Gobernador Romero Barceló, candidato oficial del Partido Nuevo Progresista a la reelección, diciendo: 'Hernández Colón quiere volver a la Gobernación . . . ¿para qué?'" (Énfasis suplido y en el original.) *Hernández Colón v. Srio. de Hacienda*, supra, págs. 163–164.

Y finalmente consignamos: "El Departamento de Hacienda justificó la investigación *ex parte* sobre la base de 'interrogantes que fueran señaladas al Departamento a través de la prensa del país'. Sin embargo, adoptó este singular curso de acción para cancelar todas las exenciones e ignoró sus propias prácticas administrativas que de ordinario permiten a los contribuyentes obtener remedios administrativos. ¿Era anticipable que sus adversarios políticos usufructuaran todo este proceder administrativo? ¿Quién dio la orden para que se investigara? ¿Quién instruyó que se diera inmediatamente a la publicidad? Todas estas interrogantes debieron dilucidarse en el juicio plenario. La seriedad del asunto lo amerita. Lo menos que surge es una preocupación de falta de tacto y sensibilidad; lo más, una carencia de espíritu democrático y de tolerancia política hacia un líder opositor de un partido principal." *Hernández Colón v. Srio. de Hacienda*, supra, págs. 164–165.

Lausell Hernández quien *inició públicamente una campaña para no rendir sus planillas*. En el 1984 las destruyó ante la prensa frente al edificio del Departamento de Hacienda. *Desde el primer momento retó para que fuera procesado criminalmente*. Aun así, el Estado no lo hizo. Únicamente después de haber provocado la acción oficial, agotar todos los esfuerzos administrativos y hacer caso omiso a las exhortaciones de la Fiscalía, el Estado optó por la vía penal.

■ Difícilmente estas circunstancias avalan discrimen político. En sus acepciones básicas, *discriminar* significa "[s]eparar, distinguir, diferenciar una cosa de otra. 2. Dar trato de inferioridad a una persona o colectividad por motivos raciales, religiosos, políticos, etc.". *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. I, pág. 505.

Realmente fue el apelante Lausell Hernández, inspirado en sus convicciones, quien se autoseleccionó y separó del curso y trámites ordinarios. Rechazó todas las vías conciliatorias administrativas y provocó su enjuiciamiento. No hay la más mínima evidencia de que antes de ser candidato a la gobernación, en 1980, por el Partido Socialista Puertorriqueño (P.S.P.), Lausell Hernández fuera investigado, subestimado o, de algún modo, presionado u hostigado por el Departamento de Hacienda debido a sus ideas políticas. Es más, aun cuando no rindió sus planillas para los años 1981, 1982 y 1983, el Departamento de Hacienda nada hizo en su contra. Solamente cuando *públicamente* rompió sus planillas en abril de *1984* es que el Departamento de Hacienda decide investigarlo. En ningún momento, hasta esa fecha —ni subsiguientemente— hubo el más mínimo indicador de discrimen o persecución. El historial al respecto está huérfano, carente de todo apoyo fáctico.

■ La experiencia refleja que la vía penal es un trámite usado para atender violaciones crasas a la Ley de Contribu-

ciones sobre Ingresos, o situaciones particulares, cuando se cierran los canales administrativos. Aunque de poco uso, el Ministerio Fiscal presentó en evidencia unas acusaciones criminales contemporáneas, desde la G-84-3033 hasta la G-84-3036, formuladas contra otro ciudadano por precisamente omitir el rendir planillas durante los mismos años anteriores. Nuestra jurisprudencia, si bien es escasa al respecto, también informa de tales instancias en sus variadas modalidades. *Pueblo v. Corales Irizarry*, 107 D.P.R. 481 (1978); *Pueblo v. Tursi*, 105 D.P.R. 717 (1977); *Pueblo v. Rivera Adorno*, 99 D.P.R. 555 (1971); *Pueblo v. Calzada*, supra; *Pérez Vega v. Tribunal Superior*, 93 D.P.R. 749 (1966); *Pueblo v. Franceschi*, 74 D.P.R. 825 (1953); *Pueblo v. Pietersz*, 61 D.P.R. 237 (1943).

■ La decisión del Estado de encausarlo penalmente sin antes recurrir a la práctica administrativa de llenar sus planillas "de oficio" es perfectamente comprensible. En primer lugar debemos entender su significado. En su aspecto genérico, el concepto *de oficio* implica realizar una gestión o diligencia oficial en beneficio o en contra de una persona, *sin mediar petición alguna de su parte.* Aquí, en lo particular, sería llenar el Secretario de Hacienda las planillas de Lausell Hernández. Ahora bien, ¿tenía algún sentido ese trámite cuando él públicamente destruyó *sus planillas?* Obviamente, con esa acción convirtió el simbolismo de su protesta —romper las planillas— en una impugnación que lo situó fuera del ámbito discrecional de ese beneficio. El mismo Lausell Hernández se encargó de descartarla. Su posición inflexible e intransigible no permitió otro curso de acción que las acusaciones criminales.

■ Segundo, aun en situaciones normales, la planilla "de oficio" es simplemente un mecanismo civil que no derrota ni impide la responsabilidad criminal. *United States v.*

*Lacy*, 658 F.2d 396 (5to Cir. 1981); *United States v. Buras*, 633 F.2d 1356, 1360 (9no Cir. 1980); *United States v. Millican*, 600 F.2d 273, 278 (5to Cir. 1979), *cert.* denegado, 445 U.S. 915 (1980).

En las circunstancias de autos, el no haber el Secretario de Hacienda ejercido el mecanismo de planilla "de oficio" no constituyó abuso de discreción. Como explicó el testigo licenciado Clausell Reyes, su caso era el primero en que se destruían unas planillas, aspecto crucial diferenciador de la actitud y conducta que la mayoría de los contribuyentes utilizan para solucionar administrativamente los casos con el Departamento de Hacienda. Tampoco los hechos configuran discrimen político. Si algo la prueba revela, repetimos, es que el Estado actuó razonable y congruentemente con el reclamo, reto y curso de acción trazados por el propio Lausell Hernández. Concluir lo contrario anularía todo el esquema penal fiscal estipulado en la Ley de Contribuciones sobre Ingresos. Además, no sólo tendría un efecto derogatorio, sino que potencialmente brindaría inmunidad a otros ciudadanos insertos en la política o vida pública situados en posturas similares. Quedaría sustancialmente menoscabado el valor disuasivo que el proceso penal representa en materia fiscal, según era la intención de la Asamblea Legislativa. Se afectarían negativamente intereses públicos de importancia.

Una nota final sobre este extremo. En buena juridicidad, no bastan meras generalizaciones para activar la Cláusula Constitucional sobre la Igual Protección de las Leyes. "[L]os tribunales han diseñado una prueba basada en dos elementos para evaluar este tipo de caso: (1) examinar si de ordinario personas en circunstancias análogas a las del ciudadano o contribuyente investigado o procesado han sido desatendidas por el Gobierno; y (2) indagar si la base para esa actuación o conducta administrativa responde a criterios proscritos —*United States* v. *Berrios*, 501 F.2d 1207, 1208–

1211 (2nd Cir. 1974)— tales como persecución por razones políticas o de sexo, raza y nacimiento. Bajo esta fórmula lo esencial es probar que la selección individual estuvo viciada por un ejercicio discrecional indebido, *motivada por criterios ajenos a una sana y establecida política pública administrativa.*" (Énfasis suplido y escolio omitido.) *Hernández Colón v. Srio. de Hacienda,* supra, pág. 165.

Bajo esta óptica, las circunstancias apuntadas reflejan que el Estado agotó los mecanismos razonables y no le quedó otro remedio que encausar criminalmente a Lausell Hernández con miras a mantener la estabilidad de una sana política pública administrativa. Su protesta pública y acusación no es sinonimia de discrimen político.

Aclarado este aspecto, el único tratamiento judicial balanceado es justipreciar sus móviles en la dimensión de la pena. Explorémosla.

## VI

Según expuesto, la prueba revela que Lausell Hernández —aunque técnicamente infringió durante cuatro (4) años por su propia voluntad la ley, y esa violación de ley es castigable— no tuvo fines perversos. Con o sin razón intentó llamar la atención pública sobre una causa meritoria: evitar la dilapidación injustificada de fondos públicos. Que no haya generado adeptos y que su acción carezca de valor ejemplarizante no es óbice para que así lo reconozcamos en justa perspectiva y valoración final adjudicativa para fines del castigo. No estamos ante un caso típico de evasión contributiva en que predomina el lucro personal o propósito avieso. Menos aún, que su protesta haya sido violenta o haya generado violencia.

Más bien, sus actos se perfilan en el umbral de lo que se conoce como "desobediencia civil". El concepto ha sido definido de diversas formas. Sin embargo, la propuesta por el Decano Robert B. McKay recoge la visión unánime de

las características que presenta este fenómeno de protesta. "Desobediencia civil es la violación de la ley por medios no violentos cuando la oposición a dicha ley está fundada en un profundo y arraigado convencimiento de que la ley, en sí, conflige con un principio más alto. La violación no debe ser a escondidas, sino abierta, y cualquier sanción impuesta por violar la ley debe ser aceptada y no evitada." (Traducción nuestra.) R.B. Mckay, *Civil Disobedience: A New Credo?*, 2 (Núm. 1) Ga. L. Rev. 16, 19 (1967).

Su origen se traza a Henry David Thoreau, quien en 1844 publicó su *Ensayo sobre Desobediencia Civil.* Entre sus máximes exponentes se encuentran Mahatma K. Gandhi y Martin Luther King, Jr. Sus ejecutorias y profundos cambios sociales forman parte de la historia contemporánea. No precisan ser detalladas. El biógrafo de Thoreau, Walter Harding, comprime así los postulados en que se inspira: "(1) Existe una 'ley superior' sobre la ley de la nación. Esta es la ley de la conciencia, la 'voz interna', 'del alma espiritual' — llámela como guste [;] (2) en las raras ocasiones en que esta 'ley superior' y la ley de la nación confligen, el deber de uno es obedecer la 'ley superior' y violar deliberadamente la ley de la nación [;] (3) si uno deliberadamente viola la ley de la nación, debe estar dispuesto a aceptar todas las consecuencias de esa acción, hasta el punto de ir a la cárcel[, y] (4) sin embargo, ir a la cárcel necesariamente no es el acto negativo que aparenta ser, porque puede servir para llamar la atención de personas de buena voluntad sobre la ley perversa y así ayudar a lograr que sea derogada. O, si suficientes personas van a la cárcel, sus actos servirán para ataponar la maquinaria del Estado y así convertir la ley perversa en inejecutable." (Traducción nuestra.) G. Edwards, *History, Morality & Law, A Compilation on Civil Disobedience,* 1970 Va.L. Weekly 27–28 (1970).

Aunque hay criterios opuestos en cuanto a sus variantes, se acepta que la infracción de ley debe ser castigada.(5) "Pero la desobediencia civil tiene su propio correctivo: la doctrina clama que la ley, hasta que sea cambiada, debe ser puesta en vigor. Gandhi le pidió al juez que renunciara a su cargo y se le uniera en la desobediencia civil si estaba de acuerdo con él, de lo contrario que le impusiera todo el rigor del castigo de la ley. *El fiscal, el juez o el jurado pueden tomar en considera-ción el motivo y la conciencia al decidir si acusa, condena o al dictar la sentencia*; pero un practicante de la desobedien-cia civil viola la doctrina cuando pide amnistía." (Énfasis su-plido y traducción nuestra.) H. Wofford, Jr., *Introduction, A Compilation on Civil Disobedience*, 1970 Va. L. Weekly VII–VIII (1970).

Bajo esta óptica, por la situación peculiar y única que transpira el caso de autos, a modo de excepción, *sua sponte* nos inclinamos a moderar el rigor de las sentencias reducién-dolas al mínimo establecido por el legislador: seis (6) meses de cárcel, a cumplirlos concurrentemente. También aco-gemos el reflexivo criterio del juez sentenciador, al disponer que previa actualización del informe sociopenal —de serle favorable— le suspenda el cumplimiento de las sentencias sujeto a que Lausell Hernández, dentro del término de no-venta (90) días, satisfaga el pago de sus contribuciones atra-sadas correspondientes a los años 1981, 1982, 1983 y 1984, o cumpla cualesquiera otras *condiciones sustitutas* que dicho foro en justicia le imponga.

---

(5) La literatura es abundante. Véase la bibliografía contenida en la compila-ción G. Edwards, *History, Morality & Law, A Compilation on Civil Disobe-dience*, 1970 Va. L. Weekly 27–28 (1970). Véanse, además: J. Rawls, *Justicia como Equidad: Materiales para una Teoría de la Justicia* (M.A. Rodilla, trad.), Ma-drid, Ed. Tecnos, 1986, págs. 90–101; R. Dworkin, *Los Derechos en Serio*, Barce-lona, Ed. Ariel, 1984, págs. 305, 326; A.M. Bickel, *The Morality of Consents* (M. Guastavino, trad.), New Haven, Yale Univ. Press, 1975, págs. 91–123.

De conformidad con lo expuesto, *se dictará sentencia confirmatoria.*

El Juez Asociado Señor Hernández Denton emitió opinión concurrente, a la cual se une la Juez Asociada Señora Naveira de Rodón. El Juez Asociado Señor Rebollo López emitió opinión disidente.

—O—

Opinión concurrente emitida por el Juez Asociado Señor Hernández Denton, a la cual se une la Juez Asociada Señora Naveira de Rodón.

El apelante Luis A. Lausell Hernández acude ante nos para cuestionar el veredicto rendido ante el Tribunal Superior, Sala de San Juan, mediante el cual se le encontró culpable de no rendir las planillas correspondientes a 1981, 1982 y 1983, según la Sec. 145 de la Ley de Contribuciones sobre Ingresos de 1954 (13 L.P.R.A. sec. 3145(c)), y se le sentenció a cumplir concurrentemente tres (3) años de presidio por cada cargo. Se dispuso, sin embargo, que esta sentencia se suspendería si dentro del término de noventa (90) días el señor Lausell Hernández rendía sus planillas.

En apelación, el señor Lausell Hernández solamente argumenta que su comportamiento constituyó una protesta política contra el mal uso de fondos públicos y que no había intención criminal de defraudar al Estado ni tenía fines perversos.

Ciertamente, no estamos ante un evasor contributivo común, sino ante un trabajador indignado con un gobierno por el uso del dinero recaudado mediante la Ley de Contribuciones sobre Ingresos. En protesta, y como ejemplo para otros, decidió violar la ley al no rendir las planillas. Nunca ha negado haberlo hecho. Tampoco se demostró que él tenía fines perversos o que pretendía lucrarse personalmente.

La opinión mayoritaria que hoy emite este Tribunal se enfrenta y resuelve el argumento sobre la intención criminal en sus partes I, II y III. La controversia nos permite reafirmar nuestros pronunciamientos anteriores de que, en el caso de no rendir la planilla de contribución sobre ingresos, "la voluntariedad sólo requiere prueba de que el contribuyente dejó de radicar su planilla contributiva intencionalmente no obstante tener conocimiento de tal obligación y no debido a un accidente, error u otra causa inocente . . .". *Pueblo v. Rivera Adorno*, 99 D.P.R. 555, 562 (1971). Véase, también, *United States v. Pomponio*, 429 U.S. 10, 12 (1976).

La prueba justifica la conclusión de que el apelante voluntaria e intencionalmente dejó de rendir las planillas de contribuciones sobre ingresos durante tres (3) años. Decidió cuestionar el uso del poder fiscal del Estado y, aunque respetemos sus pensamientos políticos, es nuestro deber velar por que tengamos un gobierno de leyes y no de hombres, y que el apelante cumpla con su obligación con la sociedad. Sin embargo, debemos ser justos al interpretar y aplicar el derecho. Con esto en mente, y considerando las circunstancias particulares de este caso y la naturaleza de sus actos, coincido con el criterio mayoritario de reducir la sentencia de tres (3) años a seis (6) meses y devolver el caso al foro de instancia para que, previa una actualización del informe sociopenal, se le suspenda el cumplimiento de las sentencias sujeto a que el apelante pague sus contribuciones atrasadas "o cumpla con cualesquiera otras *condiciones sustitutas* que dicho foro . . . le imponga". (Énfasis en el original.) Opinión mayoritaria, pág. 841.

Sin embargo, estimo prudente abundar sobre las otras condiciones que a nuestro juicio el foro de instancia puede considerar al condicionar los beneficios de la libertad a prueba.

# I

El sistema de libertad a prueba busca lograr la rehabilitación de los delincuentes sin exponerlos a la rigurosidad de sentencias de prisión.[1] *De Jesús v. Ramírez, Alcaide Cárcel,* 72 D.P.R. 297, 299–300 (1951); E. Meléndez Grillasca, *Manual de Sentencia,* Hato Rey, Oficina de Administración de los Tribunales, 1982. Su propósito básico "es ayudar a los individuos a reintegrarse a la sociedad como individuos productivos tan pronto sean capaces . . . . Como consecuencia, también se alivian los costos a la sociedad por mantener individuos innecesariamente confinados". 1986 Leyes de Puerto Rico 78, 79. El sistema parte de la premisa de que existen circunstancias en que es más beneficioso, tanto para el Estado como para el delincuente, dejar que éste continúe participando como miembro de la comunidad y así contribuya a su propia rehabilitación mientras cumple su sentencia.

Para lograr este propósito se permite que los tribunales fijen todas las condiciones que crean necesarias para propiciar la rehabilitación del convicto durante su libertad a prueba. Estas condiciones, aunque son discrecionales, no pueden ser arbitrarias o abusivas y deben responder razonablemente a la intensidad y a la naturaleza de la ofensa. No pueden conllevar sanciones incompatibles con el propósito rehabilitador ni fundarse en fines de castigo. Por esto, cualquier condición impuesta deberá promover la rehabilitación del convicto, desalentar su reincidencia y, de esta forma, beneficiar al Estado y a la comunidad en general. *Vázquez v. Caraballo,* 114 D.P.R. 272, 278 (1983).

Como parte de estas condiciones, nuestro estatuto permite que "la persona puesta a prueba . . . se[a] requerida para que, mientras estuviere en libertad a prueba, resarza a

---

[1] *Vázquez v. Caraballo,* 114 D.P.R. 272, 275 (1983); *Alcalá v. Corte,* 66 D.P.R. 430, 433 (1946).

la parte perjudicada de los daños que le hubiere ocasionado o para que asuma la obligación de corregir el mal causado por su acto delictivo". 34 L.P.R.A. sec. 1027.(2) En este último tipo de casos nuestra función judicial nos requiere que seamos creativos en la búsqueda de las alternativas para lograr que una persona pueda "asum[ir] la obligación de corregir el mal causado por su acto delictivo". Íd.

Por ejemplo, una manera de reparar un agravio social es mediante la asignación de unas tareas comunitarias socialmente útiles y enriquecedoras para el ser humano. Ciertamente, el concepto de servicio comunitario como parte de la rehabilitación de los delincuentes no es nada nuevo. Nació en las reformas liberales del siglo 18. R. Berger y P. White, *A Case for Public Service Work*, 32 Juv. & F. Ct. J. 49 (1981). Sin embargo, recientemente, como respuesta a los problemas del sistema carcelario y a un ánimo rehabilitador, se han vuelto a expandir las alternativas de sentencias y condiciones de probatoria para incluir el servicio comunitario. Íd.

Desde *United States v. Arthur*, 602 F.2d 660 (4to Cir. 1979), *cert.* denegado, 444 U.S. 992 (1979), los tribunales federales en Estados Unidos han resuelto consistentemente que la imposición de trabajo comunitario puede ser una condición apropiada para la reglamentación de la libertad a prueba de un delincuente bajo el estatuto federal de probato-

---

(2) "*Sec. 1027. —Sentencia suspendida y libertad a prueba; multa; restitución; custodia y supervisión*

"El Tribunal Superior podrá suspender los efectos de la sentencia que se hubiera dictado . . . y ordenará que la persona sentenciada quede en libertad a prueba . . . disponiéndose, además, que la persona puesta a prueba podrá ser requerida para que, mientras estuviere en libertad a prueba, resarza a la parte perjudicada de los daños que le hubiere ocasionado o para que asuma la obligación de corregir el mal causado por su acto delictivo. Disponiéndose, además, que una vez puesta a prueba, la persona quedará bajo la custodia legal del tribunal hasta la expiración del período fijado . . . ." 34 L.P.R.A. sec. 1027.

ria. 18 U.S.C. sec. 3651.([3]) *Higdon v. United States*, 627 F.2d 893 (9no Cir. 1980); *United States v. Restor*, 679 F.2d 338 (3er Cir. 1982); *Unites States v. Carlston*, 562 F. Supp. 181 (1983); *United States v. John Scher Presents, Inc.*, 746 F.2d 959 (3er Cir. 1984). Además, algunos estados han adoptado estatutariamente la imposición de trabajo comunitario como condición para la libertad a prueba.([4]) En ambos casos, ya sea bajo la autoridad general del tribunal de imponer condiciones en el sistema federal o bajo la autoridad específica de algunos estados, tribunales y comentaristas están de acuerdo en que el énfasis en el trabajo comunitario como alternativa se funda en las ventajas que ofrece tanto al estado como al delincuente. Entre éstas se cita repetidamente: (1) el efecto terapéutico sobre el delincuente; (2) los servicios valiosos que recibe la entidad para la cual trabajará; (3) la visión pública de que se ha hecho justicia, y (4) los ahorros al estado en la manutención de un prisionero. *United States v. Arthur*, supra; 3 *The ABA Standards for Criminal Justice* Sec. 18-2.4 (2da ed. 1980); B. Brown, *Community Service as a Condition of Probation*, 41 Federal Probation 7 (dic. 1977);

---

([3]) *"Sec. 3651. Suspension of sentence and probation*

"Upon entering a judgment of conviction of any offense not punishable by death or life imprisonment, any court having jurisdiction to try offenses against the United States when satisfied that the ends of justice and the best interest of the public as well as the defendant will be served thereby, may suspend the imposition or execution of sentence and place the defendant on probation for such period and upon such terms and conditions as the court deems best.

.      .      .      .      .      .      .      .

"While on probation and among the conditions thereof, the defendant—
"May be required to pay a fine in one or several sums; and
"May be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had . . . ." 18 U.S.C. sec. 3651.

([4]) Por ejemplo, véanse los estatutos sobre libertad a prueba en Alaska, Hawaii, Illinois, Kansas, Maine, Maryland, Mississippi, Nueva York, Ohio (en delitos menos graves) y Oklahoma. A.T. Harland, *Court-Ordered Community Service in Criminal Law: The Continuing Tyranny of Benevolence?*, 29 Buffalo L. Rev. 425, 432–439 (1980).

Jaffee, *Probation with a Flair: A look at some Out of the Ordinary Conditions*, 43 Federal Probation 25 (marzo 1979); A.T. Harland, *Court-Ordered Community Service in Criminal Law: The Continuing Tyranny of Benevolence?*, 29 Buffalo L. Rev. 425 (1980); Nota, *Punishing the Corporation: Charitable Contributions as a Condition of Probation*, 15 Rutgers L.J. 1069 (1984).

Este tipo de condición requerirá que el convicto dedique tiempo y esfuerzo a trabajar en algún proyecto de interés público en busca de crearle un sentido de responsabilidad social. Es una "restitución simbólica" a la comunidad por el daño causado al violarse la ley. Antes de decidir imponerla, el tribunal deberá estudiar las circunstancias en que el delito fue cometido, su naturaleza y si existe algún problema de conducta o carácter que requiera la reclusión del convicto. Requiere, además, que el tribunal considere la necesidad de la rehabilitación del convicto y la protección de la comunidad en general. *Pueblo v. Álvarez Maurás*, 100 D.P.R. 620 (1972); *Higdon v. United States*, supra.

Este enfoque ya ha sido aceptado en la jurisdicción federal en casos en que la "víctima" del daño es el Estado y no vemos por qué hoy no debamos llegar a la misma conclusión. *United States v. Arthur*, supra; N.P. Cohen y J.J. Gobert, *The Law of Probation and Parole*, Colorado, Ed. Shepard's McGraw-Hill, 1983, Sec. 6.28, págs. 271, 272. Por ejemplo, en *United States v. Carlston*, supra, se impuso a un convicto por evasión contributiva la condición de dar clases gratuitas de programación y uso de computadoras.

## II

En el caso de autos, el informe presentencia sobre el apelante fue completamente favorable. Se trata de un jefe de familia, padre de cinco (5) hijos, trabajador, querido y respetado por su familia, sus vecinos y sus compañeros de trabajo. El apelante es un conocido líder obrero y pasado Presidente

de la Unión de Trabajadores de la Industria Eléctrica y Riego (U.T.I.E.R.). También se ha destacado en la arena política y, en el 1980, fue candidato a Gobernador por el Partido Socialista Puertorriqueño. Como parte de su gestión laboral, dirigió una campaña de protesta contra la administración del entonces Gobernador, Hon. Carlos Romero Barceló. Como acto público simbólico de protesta, se negó a rendir las planillas de contribución sobre ingresos.

Al evaluar la concesión de probatoria a este conocido líder obrero puertorriqueño, debemos también tomar en consideración que la totalidad de las circunstancias que rodean el caso de autos nos crea una grave preocupación sobre el uso de leyes fiscales por el Departamento de Hacienda, para penalizar aquellos que públicamente cuestionan el uso de fondos públicos por el Gobierno.

Ante el tribunal de instancia el apelante presentó prueba del procedimiento administrativo usado por el Departamento de Hacienda en los casos de personas que no rinden planillas, incluso el caso del señor Lausell Hernández. El Lcdo. Carlos Luis Clausell declaró que había trabajado más de veintiún (21) años para el Departamento de Hacienda y que el procedimiento para estos casos no era acudir a los tribunales. Declaró que se informaba al contribuyente de la deficiencia y se le citaba al Departamento de Hacienda para que llenara su planilla. Si se negaba, se le podía llenar una "de oficio" y se tramitaba. Finalmente, señaló que si la persona se negaba a cooperar, el caso podía llegar a los tribunales, pero que eso era muy poco común.

En cambio, al señor Lausell Hernández se le presentaron acusaciones criminales y no se le citó al Departamento de Hacienda para solicitarle que cumpliera con la ley. Todo lo contrario, se le convocó a las Oficinas de Fiscalía, se le acusó y se le encarceló. Aunque el apelante no lo planteó y la prueba tampoco revela una aplicación discriminatoria y arbitraria de las leyes, nos preocupa que la notoriedad de su acto

de protesta influyó en la decisión del Secretario de Hacienda de encausar criminalmente al apelante y ahora puede perjudicarlo en la imposición de la condición para la libertad a prueba.

Por último, surge del informe presentencia que el señor Lausell Hernández no tiene un récord criminal previo y de los informes sometidos por los trabajadores sociales no se desprende que él constituye peligro para sus semejantes o para la sociedad en general. Tampoco podemos ignorar que durante los años en que no rindió planilla el señor Lausell Hernández pagó parcialmente sus contribuciones cuando el Estado retuvo de sus salarios las cantidades previamente calculadas, según la fórmula establecida por el Departamento de Hacienda. Evidentemente, no se trata de una persona que ha cometido un fraude o que ha obtenido sus ingresos mediante actividades delictivas. Sin embargo, no hay duda de que al no rendir las planillas correspondientes violó la Ley de Contribuciones sobre Ingresos.

Ciertamente, existen numerosas funciones en las que el señor Lausell Hernández puede contribuir a la sociedad. Así, se podría aprovechar su interés en contribuir a mejorar las condiciones socioeconómicas del país. ¿Por qué no requerirle, por ejemplo, que durante el tiempo que permanezca en probatoria trabaje, sin recibir remuneración, medio día semanalmente en un hospital, en una entidad de ayuda a adictos a drogas o hasta en el propio Departamento del Trabajo y Recursos Humanos.

En vista de que el delito cometido fue el producto de una protesta contributiva, considerando la publicidad que generó y el trámite especial seguido por el Secretario de Hacienda al acusarlo por un delito criminal, posiblemente con propósito aleccionador durante la época en que la agencia llevaba a cabo su campaña anual de imposición de contribución, es de esperarse que de acuerdo con sus principios el señor Lausell Hernández se niegue a rendir sus planillas atrasadas. *Impo-*

*nerle su presentación como condición para ser merecedor de una sentencia suspendida equivale a obligarlo a ir a la cárcel por sus pensamientos políticos.*

Como nunca es tarde para corregir la inequidad del sistema y evitar una injusticia, estoy convencido de que además del mandato de este Tribunal, el foro de instancia, al evaluar y actualizar el informe socioeconómico, prudencialmente puede suspenderle el cumplimiento de la sentencia a cambio de algún tipo de trabajo comunitario. Este curso decisorio sería más justo, serviría mejor los intereses del Estado y adelantaría los propósitos de la ley de sentencia suspendida y de la Ley de Contribuciones sobre Ingresos.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

La utilización de leyes fiscales como mecanismos de presión y persecución no tiene cabida alguna en nuestro sistema democrático de gobierno. Dicho curso de acción debería merecer el más enérgico y unánime repudio de parte de este Tribunal, el cual se supone que sea el máximo guardián y garantizador de los derechos ciudadanos que consagra la Constitución del Estado Libre Asociado de Puerto Rico. Hoy rechazamos y condenamos dicha acción al igual que lo hicimos en 1984 en *Hernández Colón v. Srio. de Hacienda,* 115 D.P.R. 145, 167 (1984).

Disentimos en el presente caso por cuanto la prueba presentada en el mismo a nivel de instancia y las inferencias lógicas y razonables que de la misma pueden hacerse nos convencen de que el Estado, al acusar y procesar al apelante Luis A. Lausell Hernández, *aplicó selectiva y discriminatoriamente* las disposiciones de la Sec. 145 de la Ley de Contribuciones sobre Ingresos de 1954 (13 L.P.R.A. sec. 3145(c)), en violación de la Cláusula sobre la Igual Protección de las

Leyes de nuestra Constitución. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

I

Como es de todos conocido, el apelante Luis A. Lausell Hernández es una persona sumamente conocida que se ha desenvuelto tanto en el ámbito obrero-patronal como en el político.(1) Para los tres (3) años en que el referido apelante no rindió las planillas de contribución sobre ingresos(2) — acción en relación con la cual en 1985 la actual administración de gobierno le imputó la violación de la citada Sec. 145 de la Ley de Contribuciones sobre Ingresos de 1954—(3) éste era un empleado de la Autoridad de Energía Eléctrica de Puerto Rico. La referida Autoridad, como todo patrono viene obligado a hacerlo en Puerto Rico, retuvo del salario del apelante durante los años en controversia una cantidad del mismo por concepto de contribución sobre ingresos, dinero que por mandato de ley dicho patrono envió al Departamento de Hacienda. Como es de todos conocido, la cantidad de dinero que es retenida por el patrono por concepto de contribución sobre ingresos se calcula a base de una fórmula porcentual que provee el propio Departamento de Hacienda, la cual toma en consideración no sólo el salario que recibe la persona, sino las deducciones particulares a que tiene derecho dicho empleado, tales como si es jefe de familia, el número de dependientes que tiene, etc. Ello se hace con el objetivo de que dicha suma de dinero sea suficiente para cubrir la responsabilidad contributiva del empleado, lo cual, de

---

(1) El apelante fue Presidente de la Unión de Trabajadores de la Industria Eléctrica y Riego (U.T.I.E.R.) y en 1980 fue candidato al cargo de Gobernador de Puerto Rico por el Partido Socialista Puertorriqueño.

(2) En 1981, 1982 y 1983.

(3) Surge de los autos originales que las denuncias fueron radicadas el 15 de abril de 1985 y los correspondientes pliegos acusatorios el día 8 de mayo de 1985.

ordinario, así resulta ser a menos que éste haya devengado ingresos adicionales a su salario regular.

Resulta necesario enfatizar, en su consecuencia, que en el presente caso no se trataba de un "evasor contributivo"; esto es, uno de los muchos ciudadanos que viven en nuestro país que no sólo no rinden sus planillas, sino que no le pagan al fisco suma de dinero alguna por concepto de contribución sobre ingresos. A lo sumo, y de haber percibido el apelante ingresos adicionales a su salario durante los años en controversia, éste hubiera tenido que pagar una cantidad mínima adicional a la ya retenida en su origen por la Autoridad de Energía Eléctrica.

No hay duda de que el apelante, conforme las disposiciones pertinentes de la Ley de Contribuciones sobre Ingresos, al haber recibido durante dichos años ingresos en exceso de los $2,000 venía en la obligación de radicar las correspondientes planillas. Igualmente correcto lo es el hecho de que la citada Sec. 145 de la referida ley dispone que:

(c) *Dejar de Rendir Planillas.*—Cualquier persona obligada bajo este subtítulo a rendir una planilla o declaración que voluntariamente dejare de rendir dicha planilla o declaración, dentro del término o términos fijados por ley o por reglamentos, en adición a otras penalidades provistas por ley, será culpable de un delito grave y castigada con multa no menor de quinientos (500) dólares ni mayor de diez mil (10,000) dólares o reclusión por un término no menor de seis (6) meses ni mayor de cinco (5) años, o ambas penas, más las costas del proceso. 13 L.P.R.A. sec. 3145(c).

Ahora bien, la referida Ley de Contribuciones sobre Ingresos contiene una disposición muy particular, la cual le permite al Secretario de Hacienda "hacerle a un ciudadano una planilla de oficio". A esos efectos, dispone la Sec. 416 de la referida ley:

*Planillas de oficio*
(a) *Facultad del Secretario.*—Si cualquier persona dejare de rendir una planilla en la fecha prescrita por ley, *el Secreta-*

*rio hará la planilla* por la información que él tenga y por aquella otra información que pueda obtener mediante testimonio o de otro modo.

(b) *Validez de la Planilla.*—Cualquier planilla así hecha y suscrita por el Secretario, o por cualquier funcionario o empleado del Negociado de Contribución sobre Ingresos, será prima facie correcta y suficiente para todos los fines legales. (Énfasis suplido.) 13 L.P.R.A. sec. 3416.

La prueba presentada por el apelante durante el proceso criminal que le fuera celebrado ante la Sala de San Juan del Tribunal Superior de Puerto Rico —*la cual no fue refutada en forma alguna por el Estado*— demostró que el Departamento de Hacienda soluciona *administrativamente* las situaciones como la que presenta el caso del apelante. Esto es, se cita a las personas concernidas a las oficinas del referido Departamento de Hacienda —*y no a la Fiscalía de Distrito de San Juan, como hicieron funcionarios del Departamento de Justicia en el presente caso, acción que la mayoría del Tribunal, increíblemente, cataloga como agotamiento de "todos los esfuerzos administrativos"*— donde, de la persona no acceder a rendir la planilla, se procede a llenarle una "de oficio"; ello bajo la facultad que le confiere la citada Sec. 416. Desfiló, en adición, ante el tribunal de instancia prueba específica de que para la fecha del juicio esta práctica administrativa estaba en vigor desde hacía más de veinte (20) años.

¿Por qué no se siguió dicha práctica administrativa en el presente caso? Esto es, ¿por qué el Estado intervino con Luis A. Lausell Hernández a través de su *Departamento de Justicia* en lugar de hacerlo por medio del Departamento de Hacienda? La interrogante nos lleva al punto neurálgico que, a nuestro entender, plantea el recurso.

## II

No tenemos duda de que nos encontramos ante un estatuto —la Sec. 145— que es neutral y constitucional de su faz

y que se proyecta sin hacer distinción alguna entre personas. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975). Ahora bien, es de todos conocido que aun ante estatutos como el que ocupa nuestra atención, puede surgir un problema constitucional si el mismo es aplicado en forma arbitraria, selectiva y discriminatoria a una persona o a un grupo de personas. *Carter v. Jury Commission*, 396 U.S. 320, 337 (1970). Ello, como es sabido, constituye una violación del derecho a la igual protección de las leyes.

No se trata de que el Gobierno de Puerto Rico no pueda acusar criminalmente a sus ciudadanos, bajo las disposiciones de la antes citada Sec. 145 de la Ley de Contribuciones sobre Ingresos, por no rendir planillas. Se trata de que no lo puede hacer *en forma selectiva y discriminatoria* en violación del Art. II, Sec. 1 de nuestra Constitución, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257, el cual dispone que:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.

Al discutirse el alcance de la cláusula constitucional citada en el seno de la Convención Constituyente se vertieron, en lo pertinente, expresiones como las siguientes:

> *Ideas políticas o religiosas.* Se reconoce el derecho a tener ideas políticas y convicciones religiosas diferentes y en conflicto entre sí *sin que esta diferencia o este conflicto milite en favor o en contra de ciudadano alguno en sus relaciones con el Estado.* La libertad de pensamiento y la libertad de conciencia quedan aquí protegidas no sólo en su expresión sino también en las consecuencias de esta expresión.
>
> .    .    .    .    .    .    .    .
>
> El más amplio reconocimiento del derecho a diferir *y ser, no obstante, tratado con igualdad y protegido en esa diferencia*

*por el poder público,* es uno de los rasgos definidores de la democracia liberal. (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2562 (1951).

En *Clemente v. Depto. de la Vivienda,* 114 D.P.R. 763, 767–768 (1983) —caso en que revocamos la sentencia, desestimatoria de la demanda, emitida por el tribunal de instancia y en que devolvimos el mismo al mencionado foro para que dilucidara la alegación, por parte del demandante, de que se le despidió de su empleo por razón de discrimen político— expresamos que en "el pasado hemos sido muy celosos y rigurosos en nuestra fundamental tarea de proteger *la libertad ideológica contra gestiones represivas del Estado* o algunos de sus funcionarios", que el "lenguaje del citado Art. II, Sec. 1 de nuestra Constitución es expreso, claro e inequívoco; *prohíbe y protege a un ciudadano contra toda clase de discrimen*", y que dicho lenguaje sencillamente "garantiza el disfrute de la libertad ideológica a que tiene derecho todo individuo en una sociedad democrática como la nuestra". (Énfasis suplido y en el original.)

## III

¿Existe prueba en el récord que justifique o sostenga la posición del apelante a los efectos de que la "estrategia obvia [del Estado] era procesar criminalmente al apelante, *tal vez como castigo por su militancia política* o tal vez para establecer un ejemplo dirigido a desalentar a otros osados . . ."? (Énfasis suplido.) Alegato del apelante, pág. 9.

Es un hecho incuestionable que el apelante es un activo militante —candidato en 1980 al cargo de Gobernador de Puerto Rico— de un partido de minoría en nuestro país, la cual agrupación política es de ideología completamente distinta al partido de gobierno en el poder en 1985, año en que se pone en marcha la maquinaria judicial en su contra. Tampoco puede haber duda sobre el hecho de que el "movimiento" que comenzó el apelante —mediante el cual instaba

a sus conciudadanos a no rendir planillas como protesta ante la "corrupción existente en el Gobierno de Puerto Rico"— es uno que puede y debe catalogarse como de tipo político. Por otro lado, y como expresáramos anteriormente, el apelante presentó prueba —mediante el testimonio de un empleado supervisor del Departamento de Hacienda— que demuestra *que su caso era uno que resultaba ser único* ante la práctica prevaleciente en dicho Departamento de solucionar administrativamente esta clase de situaciones.(4) No debe olvidarse que el Estado —*en lugar de lidiar con el apelante a través del Departamento de Hacienda, el cual con toda probabilidad hubiera solucionado administrativamente el asunto*— optó en el presente caso por hacerlo a través de *funcionarios del Departamento de Justicia,* los cuales citaron al apelante a la Fiscalía del Distrito de San Juan. En dicho lugar, luego de que Lausell Hernández declinara la "invitación" de rendir sus planillas que le extendieran dichos funcionarios, éstos inmediatamente procedieron a radicar cargos criminales contra el apelante. Por último tenemos que el Estado, teniendo amplia oportunidad para explicar el porqué de la desviación de una práctica administrativa en vigor por más de veinte (20) años, no presentó prueba alguna a esos efectos ni ofreció explicación alguna sobre su proceder en este caso en específico.

Ante todo este cuadro fáctico, somos del criterio que resulta lógica y razonable la inferencia de que la radicación de cargos contra el apelante por violación a la Sec. 145 de la Ley

---

(4) Las decisiones citadas por la opinión mayoritaria con el propósito de demostrar que el presente caso no es único —*Pueblo v. Corales Irizarry,* 107 D.P.R. 481 (1978); *Pueblo v. Tursi,* 105 D.P.R. 717 (1977); *Pueblo v. Calzada,* 93 D.P.R. 803 (1966); *Pérez Vega v. Tribunal Superior,* 93 D.P.R. 749 (1966); *Pueblo v. Franceschi,* 74 D.P.R. 825 (1953); *Pueblo v. Pieterz,* 61 D.P.R. 237 (1943)— *no* sostienen su posición. En dichos casos, *los contribuyentes efectivamente rindieron sus planillas.* Se les acusaba de evasión contributiva; esto es, *de no haber reportado la totalidad de sus ingresos.*

de Contribuciones sobre Ingresos de 1954, *supra*, fue una acción selectiva y discriminatoria, motivada por cuestiones políticas, en clara violación de las disposiciones del Art. II, Sec. 1 de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*. La mejor prueba de ello lo constituye la acción de la mayoría del Tribunal, prácticamente sin precedentes, de reducir —"a modo de excepción, *sua sponte*"— al mínimo prescrito por ley la pena de prisión que le fuera impuesta al apelante por el tribunal de instancia. Tal parece como si dicha acción tuviese el propósito de acallar la preocupación de todos, y tal vez el convencimiento, de que Luis A. Lausell Hernández fue acusado criminalmente por no rendir sus planillas precisamente por llamarse y tratarse de Luis A. Lausell Hernández y no de "John Doe" o de "Pepe Pérez".

La violación constitucional cometida no se subsana reduciendo el término de la condena de prisión impuéstale al apelante, como tampoco concediéndole a éste los beneficios de una sentencia suspendida sin condiciones o imponiéndole el deber de realizar trabajo comunitario. *No es cuestión de atemperar ni suavizar las convicciones por delito grave que pesan sobre los hombros del apelante.* Dicha violación constitucional únicamente se rectifica condenando y rechazando de plano la actuación del Estado y revocando las convicciones decretadas.

Por las razones antes expresadas, revocaríamos las sentencias criminales apeladas.([5])

---

([5]) Debe quedar claro, sin embargo, que el resultado que proponemos no tiene el efecto de impedir que el Gobierno de Puerto Rico pueda cobrarle al apelante las sumas de dinero que éste alegadamente le adeuda al Estado por concepto de contribución sobre ingresos; las mismas podrán ser recobradas mediante la utilización de los procedimientos civiles pertinentes.